Sutlot, J.
I am unable to concur in the opinion expressed by the majority of the court, that the relators are legally imprisoned; and I will here express the reasons of my dissent.
While the minority of the court differ with the majority in the conclusions to which they have arrived, I believe there is no difference in our views upon those propositions constituting the premises-from which the conclusions I arrive at are deduced.
We all agree that if the act of Congress under which the relators have been convicted is unconstitutional, their imprisonment is illegal, and they ought to be discharged.
We agree also that the federal government is a government of limited and enumerated powers, and that it can only legislate over the lives and liberties and interests of the citizens of the states to the extent and within the limits of the powers delegated to it under the constitution.
It is further agreed by us that if the power to enact the fugitive *act of 1850 has not in fact been delegated by the states under the constitution to Congress, the same having in such case been enacted without power by Congress, is void.
Again, we agree that if the provisions of this act are in conflict with, or repugnant to, any provisions of the constitution of the United States, even though power had been delegated to Congress *184 to pass a fugitive law, still,-in such a case, the act would be iu that regard unconstitutional and void.
In either of the cases supposed, we all agree that the act, although having the form of law, should be regarded as unconstitutional, and the imprisonment of the relators consequently illegal. And in such case, under the application of the rule laid down by this court in Ex parte Shaw, 7 Ohio St. 81, the relators would be entitled to relief from their imprisonment by habeas corpus.
Starting from these premises in which we all concur, I am unable to arrive at the'conclusion expressed by the majority of the court, that the relators are not entitled to a discharge from imprisonment.
I concur fully with the proposition that we can not take notice of any irregularities, if any appeared in the proceedings of the district court, nor have we any power to revise the judgment of that court.
¥e can only discharge the relators upon finding them illegally-imprisoned. If their imprisonment is one under a judgment of a court having jurisdiction in the case, the judgment is obviously valid until reversed, however irregular the proceedings. But on the cpntrary, if the imprisonment is under the judgment of a court having no jurisdiction in the case over them, the relators are illegally imprisoned. . For in such a case the whole proceeding would be void, and the judgment a nullity. Nor would there be any difference between the case of a court proceeding to give judgment without its'jurisdiction upon a valid law, and ^proceeding within its territorial jurisdiction to give judgment upon an utterly invalid statute.
It is insisted on the part of the relators that Congress had no power to pass the act under which judgment, has been pronounced against him; and that, therefore, their conviction and imprisonment are void, in the same sense as if Congress had passed any other police law over the citizens of a state without authority, and they had in like manner'been imprisoned under the same.
The principal question, then, upon which this case ought to turn, is, had Congress power to pass the act under consideration, and by force of which the relators are imprisoned? If Congress had power to pass the act, the imprisonment, for the purpose of this inquiry, should probably be regarded as legal, and the prisoners remanded. If Congress had not the power, the act is void, and the imprisonment consequently illegal, and the prisoners ought to be discharged.
*185 It being admitted that the power to legislate upon the subject under consideration belonged originally to the states respectively, .and that if it was in fact held by the federal government at the time of enacting the law in 1850, it was derived from the states by some provision contained in the constitution, it is incumbent upon those •claiming the power for the federal government, to show a title, with reasonable certainty. And this can, obviously, only be shown by the same evidence of title that any other cession of property or power from the state to the general government could be shown. The instrument under which the cession is claimed must be the only •evidence, as a general rule, to substantiate the claim of title.
■ It has been well remarked, by Justice Story, that “ much of the •difficulty which has arisen in all the public discussions on this subject, has had its origin in the want of some uniform rules of interpretation, expressly or tacitly agreed on by the disputants.....
In short, the rules of interpretation have often been shifted to suit the emergency; *and the passions and prejudices of the day, •or the favor and odium of a particular measure, have not unfrequently furnished a mode of argument which would, on the one hand, leave the constitution crippled and inanimate, or, on the other hand, give it an extent and elasticity subversive of all rational boundaries. Let us, then,” he continues, “ endeavor to ascertain what are the true rules of interpretation applicable to the constitution, so that we may have some fixed standard by which to measure its powers and limit its prohibitions, and guard its obligations, and enforce its securities of our rights and liberties.” The learned commentator then proceeds to lay down the following rules :
“ 1. The first and fundamental rule in the interpretation of all instruments, is to construe them according to the sense of the terms, and the intention of the parties.
“ Where the words are plain and clear, and the sense distinct and ■perfect, arising on them,' there is, generally, no necessity to have recourse to other means of interpretation. It is only where there is ■some ambiguity or doubt arising from other sources, that interpretation has its proper office.
“ 2. In construing the constitution of the United States, we are, in the first instance, to consider what are its nature and objects, its scope and design, as apparent from the structure of the instrument viewed as a whole, and also viewed in its component parts. Where its words are plain, clear, and determinate, they require no interpretation, and *186 it should therefore be admitted, if at all, with great caution, and only from necessity, either to escape some absurd consequence, or to guard against some fatal evil; . . . . and whenever it is a question of power, it should be approached with nflnite caution, and affirmed only upon the most persuasive reasons.”
Again Judge Story says, in speaking of the constitution being established: “They have made it a limited ^government. They have defined its authority. They have restrained it to the exercise of certain powers, and reserved all others to the states or to the people.” Speaking of contemporaneous interpretation, he says: “It is obvious, however, that contemporary interpretation must be resorted to with much qualification and reserve. In the first place, the private interpretation of any particular man, or body of men, must be open to much observation. The constitution was adopted by the people of the United States, and it was subinitted to the whole people, upon a just survey of its provisions, as they stood in the text itself.” . . . “Nothing but'the text itself was adopted by the people. And it would certainly be a most extravagant doctrine to give to any commentary then made, and, a fortiori, to any commentary since made under a very different posture of feeling and opinion, an authority which should operate an absolute limit upon the text, or should supersede its natural and just interpretation. Contemporary construction, when properly resorted to, can,” continues he, “never abrogate the text; it can never fritter away its obvious sense; it can never narrow down its true limitations; it can never enlarge its natural boundaries.”
These rules and remarks of this learned commentator are all only to the effect that the same rules are applicable to the constitution as to other instruments of writing, to ascertain their real meaning. In the first place, if the meaning is fairly deducible from the language used, then the well-known maxim applies that it is not allowable to interpret what has no need of interpretation.
Let us, then, in the light of authority and reason, recur to the constitution, and see if it maybe determined, from the plain meaning of the text thereof, whether the states have thereby delegated to the federal government the power claimed.
The power is claimed to have been delegated by the states under the second section of article 4 of the constitution, which provides as follows:
*187 *“ Sec. 2. The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.
“ A person charged in any state with treason, felony, or other-crime, who shall flee from justice and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the'state having jurisdiction of the crime.
“ No person, held to service or labor in one state under the laws thereof, escaping into another, shall, in consequence of any law or-regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom: such service- or labor may be due.”
No argument is needed to show that the'power of legislation is not delegated to the federal government by the provisions of this section, as expressed in the language thereof.
The language of the entire 4th article of the constitution is, as it seems to me, conclusive against the claim to power, on the part of the federal government, delegated to Congress by the states under-the third clause of section 2 of that article. Not only is there an utter absence of all language professing to delegate any power by the states to Congress, or any other department or officer of the-federal government, but the article indicates that it was not intended that any power should be thereby delegated. The first, section and the third of the same article, the one preceding and the one following the section under consideration, expressly delegate-power to Congress in relation to .the provisions in those two-sections; while section 2, as stated, contains no delegation of power. The maxim expressio unius, exclusio alterius, therefore, here applies with double force, to show that it was not intended that any power should be delegated to' Congress under section 2.
*Add to the foregoing the consideration that the tenth article of amendments of the constitution — that “the powers not delegated to the "United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively or to-the people” — and it seems to me morally certain that no power is delegated by these provisions, express or implied.
But we have seen the rule to be, that where the words of the-instrument are “ plain, clear, and determinate, they require no interpretation.” And what words can be more plain, clear, and determinate than those under consideration: “No person held to- *188 •service or labor in one state under the laws therepf, escaping into another, shall, in consequence of any law or regulation therein, be .discharged from such service or labor; but shall be delivered up on claim of the party to whom such service or labor maybe due.”
If it be said, the clause may require legislation for its enforcement, let it be conceded; and still there is no doubt or ambiguity thereby thrown upon what is expressed. For'inasmuch as the states have in no preceding clause of the constitution delegated the power of legislating upon the subject of the extradition of fugitives, it is certain the states only have, and Congress has not, the power to legislate upon the subject. Indeed, the provision itself plainly implies that the states have not parted with this, their power which they before had, to legislate in relation to the rendition of fugitives, while it also implies that the federal government would not have the right to legislate upon the subject. The provision is, that no person held to service, etc., escaping into another •state, shall be discharged by the laws of such state. The provision is not, that the person so escaping shall not be discharged .by the laws of Congress; which would'obviously have been the proper stipulation, if it bad been contemplated that Congress, and not the states, would, under the constitution, have the power to legislate.
* Again, if the states were then understood to have delegated to Congress their power to legislate over this class of persons, can it be possible that the ’friends of the provision not only neglected to provide against the discharge of the fugitive “ in consequence of any law or regulation” of the federal government; but neglected to ask such a provision superadded, as had been in the preceding section in relation to records, to wit, “ And the Congress may by general law proscribe the manner,” etc. This inquiry can .not be answered consistently with the idea of the legislative power being understood to be delegated by the states to Congress.
There is, therefore, no ambiguity as to what is not expressed; but, as is sometimes said, to be regarded as implied; that is, that there shall be the necessary legislation upon the subject. If any such implication arises, there is, then, no ambiguity as to the .party that is to legislate. It must necessarily be the states which have the power to legislate, and not Congress, that has it not. The maxim therefore certainly applies, that it is not allowable to interpret that which has no need of interpretation.
*189 But if this clause of the constitution were, in reality, susceptible' of such an explanation by contemporaneous history or other extraneous proof, as to render doubtful, or even change, the meaning of the clause from that expressed by the language thereof, there could be no justice or equity in admitting such proof in determining the true meaning of the clause. The constitution was-submitted to the people for their acceptance “upon a just survey of its provisions, as they stood in the text itself.” The people accepted the instrument from its plain and obvious meaning, as expressed by the language thereof, and not as the meaning might be-thereafter shown by evidence not submitted to them. It is not. such a case as that of a deed or indenture executed between two-' persons, where circumstances extraneous, but within the cognizance of *eaeh at the time, are admitted in certain cases to explain some latent ambiguity or mistake.
But, even if resort be had to contemporaneous proof, there is-nothing gained thereby to show any power in Congress to legislate under this clause. Even if it were shown that the framers of the instrument had intended to confer power upon Congress, and had actually expressed such a provision in the instrument which they had subscribed, it is very obvious that, if by mistake that provision had been left out of the copy submitted to and accepted by the people of the states respectively, it could not at all qualify or vary the provision in the constitution as submitted to and accepted by the people. It could only, in such a case, be corrected by an-, amendment of the instrument.
But the real facts of the case show that the less said about contemporaneous history by those claiming an intention to delegate legislative power to Congress' under 'section 2 of article 4, the better lor their purpose.
Contemporaneous history, whether of matters within or without the constitutional convention, and both previous and subsequent to-the session of the convention, and during the time the provisions-of the constitution were discussed and considered by the people— all tend to show, very clearly, that not only was it neither intended nor understood that power should be delegated to Congress to legislate for the removal from a state of apprentices or servants owing-service in another state, but that the instrument would have been rejected, if it had contained such a power expressed therein.
.It is well known that at the time of the formation of the eonsti *190 ■tution, it was the desire and expectation of the patriots and leading .men in the slaveholding states that all the slaveholding states would follow the example of Massachusetts, Pennsylvania, and those other states which had then already passed acts of emancipation, looking ^prospectively to the utter extinction of the ■system of slavery in the states.
Shortly after the declaration of independence, strenuous efforts for the final abolition of slavery were put forth by leading men in Virginia, Pennsylvania, and other states. An abolition society had been formed, of which Benjamin Franklin was president. Mr. .Jefferson, and other distinguished friends of universal liberty, lent the cause their hearty co-operation. Virginia, it is well known, at that time held a majority of all the slaves in the southern states. But Virginia, as well as New York had, at a session of the legislature shortly preceding the constitutional convention, introduced a bill similar to the act of emancipation passed by the legislature of Pennsylvania, looking prospectively to the final abolition and removal of the evil of slavery. Virginia had also adopted a bill of rights, containing a declaration “that all men are by nature free ■.and. independent, and have certain inherent rights, of which, when they enter into a state of society, they can not by any compact deprive or divest their posterity, namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety.” In the first clause of the constitution of that state, there was also then standing a •complaint against “the inhuman use of the royal negative, in refusing the state permission to exclude' slaves by law.” Judge 'Tucker, an eminent statesman and jurist, and a professor of law in the University of William and Mary, had published the doctrine ■in that state, and without encountering any known opposition, “that it could be demonstrated that a state of slavery was wholly incompatible with the principles of our government, and of that revolution upon which it is founded.” He termed slavery “ the bitterest draught that ever flowed from the cup of affliction,” and do- • dared it to be the imposition of a grievance upon our fellow-men ten thousand times more cruel than the utmost extremity of those *grievances and oppressions of which we complained, imposed by Great Britain upon the colonies. Mr. Madison, in No. 42 -of the Federalist, expressed himself upon the subject as follows: ■“It were doubtless to be wished that the power of prohibiting the *191 importation of slaves had not been postponed until the year 1808, or rather that it had been suffered to have immediate operation.” He adds, however: “It ought to be considered as a great point gained in favor of humanity, that a period of twenty years may terminate forever, within these states, a traffic which has so long and so loudly upbraided the barbarism of modern policy.” . . . “ Happy would it be for the Africans,” he adds, “ if an equal prospect lay before them of being redeemed from the oppression of their European brethren.” The decided sentiment of opposition to slavery, and ardent desire for its earliest practicable abolition in Virginia and throughout the the United States, entertained by Washington and Jefferson, is too well understood to need any illustrations of the fact here. It is also well known that Virginia, as well as New York, having failed to procure the passage of the act for emancipation in a session of the legislature preceding the constitutional convention, renewed the effort to procure the passage of such act of emancipation after the adoption of the constitution of the United States. But the bill for that purpose, introduced into the legislature of Virginia, owing doubtless, in part at least, to the absence of Mr. Jefferson, was again defeated, while a like bill, introduced into the legislature of New York, was fortunately passed, and became a law. Add to the foregoing items of contemporaneous history the well-known facts that the granting of legislative power upon this subject was not asked as any part of the compromises in the convention, and that the members of the convention carefully excluded all words from the instrument which might seem to recognize on the part of the federal government the right or the perma-
nent continuance of slavery, and contemporaneous *history must be admitted to be very decidedly against the claim of power having been either understood or intended to be delegated to Congress under this clause of the constitution.
The fact is, all the states had joined in making a public profession of the same political faith to the nations of the world. “ We hold,” said they, “these truths to be self-evident; that all men are created equal; that they are endowed by their Creator- with certain inalienable rights, among which are life, libertv, and the pursuit of happiness. That, to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed.” For the honesty and rectitude of their intensions, they had solemnly appealed to the Supreme Judge of the *192 world; and for the support of their declaration, they mutually pledged to each other their lives, their fortunes, and their sacred honor. They had in common, by all the perils and pains and privations, bravely met and endured through a war of seven years’ duration with the most powerful nation on earth, given evidence to-the world of the honesty of their profession. And, in the formation of a constitution to secure the blessings of liberty to themselves and posterity, they refused to suffer the instrument to be-profaned by the word slavery. Their real sentiment, conduct,, and character were consistent with their professions, which .they had so earnestly and successfully maintained.
And in the spirit of this sentiment, Mr. Madison, in the convention, spoke of the toleration by the federal government of the importation of slaves for so long a term as twenty years, as 11 dishonorable to the American character” (5 Ell. Deb. 477) ; and successfully objected to the constitution being blemished by the use of the word slave. Madison Papers.
In this connection, it may also be remarked that neither Mr. Madison, nor any other writer in the series of numbers published in the Federalist, showing the precise extent *and nature of the powers delegated by the various provisions of the constitution, pretended or intimated that any power was delegated by the states, or acquired by Congress, under section 2 of article 4 of the constitution.
And in the Yirginia state convention, on the 17th day of Juno,. 1789, when this clause of the cons*itution was under consideration, Patrick Henry is reported to have said, in reply to Mr. Madison, that “ ho considered the clause which had been adduced by the gentleman as a security for his property, as no security at all. It was no more than this, that a runaway negro could be taken up-in Maryland or New York.” 3 Ell. Deb. 335. And to this view of the provision a general tacit assent was given, neither Mr. Madison nor any other member questioning its correctness.
After the constitution had been framed and submitted to the-people for their consideration, Mr. Madison, in one of the series of essays already alluded to, addressed by him to the people on the subject of its adoption, uses the following language in relation-to the powers delegated and those retained thereby on the part of the states:
“ The powers delegated by the proposed constitution to the *193 federal government are few and defined. Those which are to remain with the state governments are numerous and indefinite. The former will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce, with which last the power of taxation will for the most part be connected. The powers reserved to the several states will extend to all the objects which in the ordinary course of affairs concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the state.”
However mistaken time may have shown him to have been in his understanding of the construction that the instrument must necessarily receive, Mr. Madison certainly would seem to have had very just reasons for the views *thus expressed of the powers belonging, under the provisions of the constitution, to the states and federal government respectively.
The compacts expressed by section 1, and by the 1st and 2d clauses of section 2, of article 4, of the constitution, he had carefully taken from the articles of confederation where they had stood for ten years, and been expressed, and regarded as mere treaty stipulations, conferring no power upon Congress to legislate. To the first — “ full faith and credit,” etc. — was by agreement added a power to Congress to legislate a rule for carrying out the compact ; and the same was made to constitute by itself clause 1 of the article. To the other two treaty stipulations so transcribed from the articles of confederation, to wit: “the citizens of each state,” etc., constituting the first clause, and the one providing that “ a person charged in any state with treason,” etc., constituting the 2d clause of section 2, being only transcripts from the articles of confedration, without the addition thereto of any power delegated in relation to them, were grouped together, and thereto was added the other compact or stipulation, “no person hold to service or labor,” etc., taken substantially from the ordinance of 1787, constituting the third clause, and, together, forming section 2 of article 4. When he had thus carefully separated the treaty stipulations transcribed, to which the power to Congress was to appertain, and had expressly added such cession of power to Congress. expressing, in section 1 preceding, and section 3 following section 2, that Congress should have power to legislate in section 1 and section 3, but had withheld any permission to Congress in section 2 to legislate as to those stipulations, how could Mr. Madi *194 •son, or any other statesman, have foreseen that the federal government would ever arrogate to itself any powers under section 2 ? .It certainly was not and could not have been foreseen by human sagacity, that it would ever be questioned that the entire legislative power over the stipulations expressed in section 2, remained intact in the states. And especially *ought this to have been so regarded under amendment 10 of the constitution.
I have been thus particular to show that there is no express power delegated, or intended to be delegated, under this clause of section 4, for the reason that it can not, in fact, be shown that Congress has the power except by an implied delegation under this clause. And yet I am certain that no man will seriously pretend that, by the language of the clause, it can be made to appear that the states delegated, or intended to delegate, the power to Congress.
But while forced to admit the fact that there are no words used in the. clause relating to fugitives, expressive of a grant of power to Congress, or of .an intention on the part of the states to delegate any legislative power upon that subject, the advocates of congressional power still insist that the power has been derived by Congress, under that and certain other provisions of the constitution.
In the absence of any special provision authorizing Congress to legislate, it is claimed that Congress has become invested with power to legislate by virtue of three distinct provisions of the constitution. The provision in article 4, it is said, makes it a duty of the states respectively to surrender the fugitive; and section 2, of article 3, extends the judicial power to all cases arising under the constitution and laws of the United States; and the concluding clause of section 8, article 1, authorizes Congress to make the necessary laws for carrying the judicial power into execution. And under these three provisions it has been suggested that Congress may have derived power to legislate for the rendition* of fugitives. The argument may be simply stated thus: Congress has the power, under the last clause -of section 8, article 1, to pass proper laws for the organization of the judiciary, and for the execution of its judicial powers. The rendition of a fugitive is provided for under the constitution. Therefore, power of the judiciary should extend to that provision; and therefore, Congress may legislate to carry into execution, in that regard, the judicial power. Now, ^unless the premises of this fair statement of the argument be true, and unless the minor proposition of the premises be included in the *195 major, the reasoning is fallacious and the conclusion false. But the minor proposition is not included in the major, and therefore the premises are not true. The judicial power is only extended to all cases arising under the constitution and laws of the United States, etc., while the provision that- “no person held to service,” etc., is not a case. It is a compact or stipulation — it is a duty; but it is not evén a stipulation or duty on the part of the federal government, but upon the states merely. It can not, then, with propriety, be affirmed that Congress has any more power to legislate for the performance of the duty of delivering up fugitives, than for the performance of any other duty of the states under the constitution. For while Congress has the power to pass or make all laws necessary and proper for carrying into execution the powers of the judiciary, it must be remembered the powers of the judiciary only extend “to cases under the laws of the United States,” etc., and that no laws can be passed by Congress except within the limits of its delegated powers. It therefore follows that the judicial power of the federal government, as to cases arising- under the laws of the United States, is only co-extensive with the legislative power of the federal government, and therefore extends no further, in regard to cases arising under the laws of the United States, than the delegated powers to Congress to legislate. Therefore, if no power is •delegated to Congress, independent of the judiciary clause, to legislate for the rendition of fugitives, inasmuch as the power of the judiciary is only co-extensive with the power of Congress in that regard, it is certain that Congress has no power, under the grant of power to make laws to carry the judicial power into execution, to pass laws beyond the extent of the -judicial powers; and which, as we have seen, do not extend to any legislation by Congress in relation to the rendition of fugitives, Congress having no power to ^legislate on that subject. But it is absurd to say that the constitution ever contemplated a delegation of power by the states to Congress to legislate for the enforcement of duties devolved upon the states under the constitution. Nor can it with any reason be pretended that Congress has power to legislate as to any 'duty of the states, without conceding a like power to legislate for the enforcement of all duties of the states under the constitution. If, then, Congress has power to legislate respecting the duty of the states to surrender fugitives, it has the power to legislate to enforce the duty from each state, whether slave or free, to extend all the privileges *196 and immunities of citizens to the citizens of every other state, whether negroes, mulattoes, quadroons, or others, as well as whites. And it might, with equal projmiety, be claimed that Congress may legislate for the enforcement of the provision that no person shall “be deprived of life, liberty, or property without due process of law.” But it is absurd to claim for Congress the power to legislate to enforce the duties of the states, in the absence of any such power' delegated under the constitution.
In an early Congress the distinction was very clearly shown between the word “ question ” and “ cases ” as used in the 3d article of the constitution.
On the 20th of February, 1800, Edward Livingston introduced in Congress his resolutions in relation to the surrender of Jonathan Robbins, alias Thomas Nash, to Great Britain. The commencement of the second resolution was in the following language: “ That inasmuch as the constitution of the United States declares that the judiciary power shall extend to all questions arising under the constitution, laws, and treaties of the United States, and to all cases of admiralty and maritime jurisdiction,” etc. On the 7th of March, a few days after, John Marshall, afterward Chief Justice, then a member, made his speech upon the resolutions; and remarked as follows upon the substitution of the word questions in the resolution for the *word “cases” used in the constitution — said he: “A ‘case’ in law or equity was a term well understood and of limited signification. It was a controversy between parties which had taken a shape for judicial decision. If the judicial power extended to every question under the constitution, it would involve almost every subject proper for legislative discussion and decision: if to every question under the laws and treaties of the United States, it would involve almost every subject on which the executive could act. The division of power which the gentleman had stated could exist no longer, and the other departments would be swallowed up by the judiciary. But it was apparent that the resolution had essentially misrepresented the constitution.” Abridgment of Debates of Cong., vol. 2, p. 462.
I submit, then, without dwelling longer upon this proposition, that by no fair regard to the plain and express language of the provisions of the constitution, nor by any just legal rules of interpretation, can it be shown that the states ever delegated, or con- *197 rented to delegate to Congress tlie power to legislate upon the sub-, ject of fugitives from service.
But not only does it appear that the fugitive act of 1850, was passed by Congress without any express constitutional power, ana in derogation of the reserved powers of the states, but the same is, in its provisions, repugnant to the constitution of the United States.
The 5th article of the amendments of the constitution provides, that no person shall be deprived of life, liberty, or property without due process of law.
At the time of the adoption of the constitution and the amendments thereto, the phrase “.due process of law,” had a well understood meaning. The phrase was understood then, as it had long before and has ever since been understood to mean, in its legal acceptation, a suit instituted and conducted according to the prescribed forms *and usages of courts of justice for ascertaining guilt or determining title. No one then understood, and no one now understands, the phrase to be of less comprehensive import.
Article 7 of the amendments provides that in suits at common law, when the value in controversy shall exceed twenty dollars, the right ■of trial by jury shall be inviolate. And it may properly be held that a person’s claim to his liberty, or a claim for his future services for life, is a claim of sufficient magnitude to give the right of trial by jury under this provision of the constitution.
Previous to and at the time of the adoption of the constitution, it is said that the common law writ of homine replegiando, for the purpose of trying the right of the master to the service of the slave, was well known to the laws of the several states, and was in constant use for the purpose, except so far as it had been superseded by the more summary proceeding by habeas corpus, or by local legislation.
If, then, it should he said that the provision in the constitution, “ no person held to service,” etc., contemplated a summary surrender and extradition, the answer is at hand. In the first place, there is nothing in the language of the provision nor in its subject-matter contemplating a summary proceeding; but on the contrary, from the language and object of the provision, it is evident that no surrender is promised or contemplated by the provision until the ease provided for is shown; that is, 1. That the person claimed was held to service or labor under the laws of another state; 2. That such service or labor is due to the party claiming to have the person de~ *198 livered up; and, 3. That the person so held to service under the laws of such state had escaped therefrom. And all presumptions of law being in favor of life and liberty, and the claim for surrender being' a claim against liberty, it must be fairly proved.
Again: the amendment of the constitution referred to, ^being an amendment of the instrument containing the fugitive clause-relied upon, must have full effect, although it be by qualifying, or even, by necessary implication, entirely abrogating that provision requiring a surrender. There is not, however, any irreconcilable incongruity between the, fugitive clause reasonably interpreted, and the amendment. The amendment only makes certain what ought, to have been before regarded as reasonably implied, that neither under that clause of the constitution, nor any other, can a person, be deprived of his liberty except by due process of law; and that the person against whom the claim is made has a right to a jury trial, and all the ordinary facilities of a court of justice constituting. “ due process of law.”
In treating upon this subject Chancellor Kent (2 Com. 3) uses the-following language: “ It may be received as a self-evident proposition, universally understood and acknowledged throughout the country, that no person can be taken, or imprisoned, or disseized of his freehold, or liberties, or estate, or exiled, or condemned, or deprived of life, liberty, or ¡property, unless by the laws of the land, or the judgment of his peers.” <! The words ‘law of the land ’ as used in magna charta, in reference to this subject, are understood to mean, due process of law; that is, by indictment or presentment of good and lawful men-; and this, says Lord Coke, is the true sense and exposition of these words.”
The object of the fugitive act is not to surrender a criminal for his trial in another state, but to surrender a person on the claim of another person, that the person claimed is his debtor, that he owes him, not money, but services. For the provision of the constitution, and the act of 1793, in relation to fugitives from service, according to the opinions expressed by Daniel Webster, Chancellor Walworth, and others, apply as well to apprentices as to slaves. Indeed, I am not aware that a contrary opinion has ever been expressed by any jurist or statesman. It is also to be remembered that the provisions of the act of 1850, are *as general and comprehensive as any other general law in its terms. The following is one of the sections of that act:
*199 “Sec. 10. When any person held to service or labor in any state or territory, or in the District of Columbia, shall escape therefrom, the party to whom such service or labor shall be due, his, her, or their agent, or attorney, may apply to any court of record therein,, or judge thereof in vacation, and make satisfactory proof to such court, or judge in vacation, of the escape aforesaid, and that the person escaping owed service or labor to such party. Whereupon the court shall cause a record to be made of the matters so proved, and also a general description of the person so escaping, with such convenient certainty as maybe; and a transcript of such record, authenticated by the attestation of the clerk and of the seal of said-court, being produced in any other state, territory, or district in which the person so escaping may be found, and being exhibited to-any judge, commissioner, or other officer authorized by the law of the United States to cause persons escaping from service or labor to be delivered up, shall be held and taken to be full and conclusive evidence of the fact of escape, and that the service or labor of the person escaping is due to the party in such record mentioned. And upon the production by the said party of other and further evidence, if necessary, either oral or by affidavit, in addition to what is contained in the said record of the identity of the person escaping, he or she shall be delivered up to the claimant. And the said court, commissioner, judge, or other person authorized by this act to grant certificates to claimants of fugitives, shall, upon the production of the record and other evidences aforesaid, grant to such claimant a certificate of his right to take any such person identified and proved to be owing service or labor as aforesaid, which certificate shall authorize such claimant to seize or arrest and transport such person to the state or territory from which *he escaped; provided, that nothing herein contained shall be construed as requiring the production of a transcript of such record as aforesaid; but in its absence, the claim shall be heard and determined upon other satisfactory proof competent in law.”
It is true, the relators are not imprisoned under section 10, but inasmuch as this whole act of Congress in relation to the extradition of inhabitants of a state rests upon the same authority, it is proper to examine its various provisions. I have, therefore, here presented this entire section of the act; not only to show clearly the obvious fact that the claim may be made against any person, child or adult, and without regard to condition in life, but also to show the mode *200 of trial substituted by this act for that guaranteed by the constitution. Indeed, Mr. Webster, shortly after the passage of the act of 1850; in remarking upon that act, and the act of 1793, spoke of the applicability of the act to the surrender of apprentices in New England, at an early day, who were in the habit of escaping from their service into other states. And the act of 1850,. as well as that of 1793, is by its terms just as applicable to a person owing, under indenture or otherwise, only a year’s service, or even a month’s service, as it is to persons owing service for life. The claim, evidently, may bo made under this provision of the act against any person in the state. Let ub, then, suppose a case fairly within the express provisions of the act. Suppose a free white man or woman, a native-born citizen of this state, and who has in fact never been without the state, to bo seized by the claimant, by virtue of a certificate for removal obtained from a commissioner in this state upon a transcript brought from Florida, Texas, New Mexico, or any other state or territory, for the removal of the citizen to such distant state- or territory. Now, can it be gravely insisted that a free white man or woman thus arrested, under no charge of any crime or offense in the foreign *state, but merely charged with owing service, and denying the claim, is not entitled to a fair trial by jury, and to the benefit of due process of law, to make good his or her defense ? If such right does not exist under the. express provision of the constitution in such a case, in what imaginable case can a free citizen of a free state assert his claim to due process of law, or a jury trial, to show a legal defense to any unjust claim against him? — to show he does not owe service, or money, or any other debt or demand, claimed of him by another person, and upon which he has been arrested?
Again : what possibly may further show, if practicable, the right of the person seized to due process of law and a fair opportunity to disprove the claim, this fugitive act of 1850 does not require thai the person claimed as a fugitive from another state should be held to service in such state “under the laws thereof,” as is provided by th express language of the constitution, but only that the person owes service, without mention made as to the laws of what state; nor indeed whether held to. service by any law, or in violation of law. It would therefore be passing strange, if a freeman of this state when arrested on such charge of indebtedness must, under the constitution of this free republic and free state, be refused the right of making a defense to the claim, denied due process of law, and con- *201 •derailed, or rather uncondemned, subjected by force of arms to an extradition from the state.
If such be the conditions and tenure upon which American freemen hold their rights and liberties, when it could not have been while under the kingly government of Great Britain, our condition must be regarded as a truly humiliating one. Yet this is the •condition of every free citizen of every free state, or that act of 1850, in denying the right of a jury trial, and due process of law, to disprove a claim of service against11 any person,” is unconstitutional.
Again: the fugitive act, in derogation of the express provision •of article 3 of the constitution of the United States, *vests judicial powers, to be exercised under it, in commissioners appointed and to hold their offices not as judges of the United States. In the case of Martin v. Hunter’s Lessee, 1 Wheaton, 330, it is expressly laid down by the Supreme Court of the United States, that ■Congress can not vest any portion of the judicial power of the United States except in courts ordained and established by itself. And it is provided by section 3, article 2, of the constitution, that ■“the president shall commission all officers.” It therefore follows That neither justices of the peace of the several states, etc., nor commissioners, can, either of them, be a judicial officer of the federal government, being neither appointed, “ordained, or established by Congress,” nor commissioned by the president.
The act of Congress of February 20, 1812, first authorizing the •courts of the United States to appoint commissioners, made their duties very limited, and strictly ministerial, to take acknowledgments of bail, and affidavits in certain cases. The act of March 1 1817, somewhat enlarged their duties, by authorizing them to fake ■depositions. And again the act of August, 1842, enlarged their duties by authorizing them, as well as justices of the peace of the several states, under section 33 of the judiciary act of September, 24, 1789, to commit or admit to bail in cases of arrests for crime. But the office of commissioner is only a ministerial one, and can not be regarded as a judicial office under the constitution of the United States. That officer is therefore utterly incompetent, under tho constitution, to give final judgment of extradition from the the state against any of her citizens, or any person residing within the state, and entitled to the protection of her laws.
The fugitive act of 1850 is also, in certain of its provisions, in *202 conflict with the provision of section 9, article 1, that “the privilege of the writ of habeas corpus shall not be suspended,” etc. It is also inconsistent in its provisions with that of the amendment, article 4, asserting “ the right of the people to be secure in their persons.”
*1 maintain, therefore, that the fugitive act of 1850 is unconstitutional, in that it is, in its provisions, repugnant to the express provisions of the constitution of the United States.
But we are told that the question should be regarded as settled by long usage of the power of legislation by the federal government, and by general acquiescence' on the part of the state governments; and by adjudication by the federal judiciary in favor of the federal government’s claim in such legislative power.
In the first place, I deny the fact of such long usage and general acquiescence; and again I deny that such usage, acquiescence, and adjudication, if they all existed, could invest the federal government with any powers belonging to the state governments at the adoption of the constitution, and not delegated by the states under that instrument.
It is urged that the fact of the passage of the fugitive slave act of 1793 within only a few years after the adoption of the constitution, and the long acquiescence in that legislation, are weighty arguments to show that the legislative authority over fugitives from service belongs to the federal government rather than to the states. I admit that these facts, and that of no particular objection being made, at the time, to the passage of the act of 1793, are circumstances of themselves which, unexplained, would seem to favor the presumption that Congress had power to legislate on the subject. But it will, however, be found that these circumstances are fully explained, and quite overbalanced, by like circumstances, showing this power to have always in fact remained with the state governments. In the first place, the act of 1793 had for its principal object the surrender of fugitives from justice, and the provision for the surrender of fugitives from service was appended thereto. The governor of Pennsylvania, in 1791, under the provision in relation to fugitives from justice, had made a demand upon the governor of Yirginia for the surrender and delivery of three persons, who *had been indicted in Pennsylvania for kidnapping a negro and carrying him into Yirginia. The governor of Yirginia referred the matter to the attorney-general of Yirginia, who advised' *203 against the surrender on various objections, among which was expressed in his opinion, that the constitution had provided no means for executing the provision for surrendering fugitives. The governor adopted the opinion of the attorney-general, and made known the same to the governor of Pennsylvania, and expressed the hope that the case would furnish an inducement to Congress to legislate at once upon the constitutional provision. Upon this refusal, the governor of Pennsylvania, adopting the suggestion, addressed a communication to the president of the United States, in which he says : “As the attorney-general of Yirginia has suggested another* difficulty with respect to the mode of arresting fugitives from justice, I have thought the present a proper occasion to bring the subject into your view,” etc. The president laid the matter, with the-opinion of the attorney-general of the Nnited States, before Congress ; and the result was the act of 1793, entitled “an act respecting fugitives from justice, and persons escaping from the service-of their masters.” Thus, it appears, the very occasion of the passage of the act of 1793 was the enforcement of the legislation of the State of Pennsylvania upon the subject of kidnapping or-forcibly removing persons of color from that State into Yirginia, contrary to the provisions of the statute of Pennsylvania regulating the subject. Nor was it pretended by the governor or attorney-general of Yirginia, in all their objections to the demand by the-governor of Pennsylvania for the surrender of those charged with removing the negro contrary to the statute of Pennsylvania, that, the state had no power to legislate ; but the power of the State of Pennsylvania to legislate upon .the subject, and the constitutionality of the statute of that state upon which the indictment for kidnapping was predicated, were not questioned, either by *Yirginia or by the attorney-general, the president or by Congress. But the act of 1793 being about to be passed, ostensibly for the rendition of fugitives from justice, and in aid of state legislation for-the punishment of criminals removing a negro from that state, the act had appended to it the provision in relation to fugitives from service; and, so far as appears, without any occasion or request for the same; and seems to have passed without attracting any particular attention or opposition. The question of power seems toll ave been neither raised nor considered.
Such are the circumstances under which the federal government,, four years after the adoption of the constitution first assumed ta *204 ■exercise tho power of legislating in relation to fugitives from service. But the states had exercised the power all' along before, and were still exercising it at the time of the adoption of the constitution; and no change was proposed by the framers of tho constitution, and the states continued to exercise the power after tho adop' tion of the constitution. South Carolina passed laws upon the subject as early as 1695 ; Connecticut as early as 1711; and Maryland in 1715. Chief Justice Taney informs us (16 Pet. 631) that Maryland “ has continuously passed laws, ever since the adoption of the ■constitution of the United States, for the arrest of fugitive slaves from other states as well as her own.” New Jersey is said to have passed a law‘for tho surrender of fugitives from service in 1793, ■which, with an amendment in 1836, and again in 1846, has continued in force to the present time. Pennsylvania had exercised the power still earlier. Ohio, and other border free states, had also, .at the special instance of the slave states, enacted statutes for the surrender of fugitives from service ; and, indeed, the most, if not all, •the states had, previous to 1842, been in the continued exorcise of this power.
Again, tho circumstances under which the federal government first .attempted to exercise this power, show that it was a police power that was in nowise adapted for its *use under the constitution. At the time Congress passed the fugitive act of 1793, there were but .five district judges residing in all the free states; one residing in the State of Pennsylvania, and only one in the State o-f New York. And there were, at the same time, only three judges of the Supreme ■Court of the United States in the free states. It is, therefore, evident, that for the constitutional convention, or for Congress, to have vested the power of rendition of fugitives exclusively in the federal .government, and to have denied the power to the state governments, would have been to defeat the provision of the constitution requiring their surrender. Congress thus found an insuperable obstacle to asserting the title to this power to be in the federal government. It was a power which that government could not by her ■own officers use and execute. Hence, when Congress proceeded to legislate in passing the act of 1793, it seems to have been in the capacity of state legislation as well as federal. The act of 1793 — ■ strange as it may seem — proceeds to prescribe the duties of state -officers as well as of federal officers. But if Congress had power to prescribe the duties of state officers, the laws of Congress being the *205 supreme law, such state officers would of course be bound to disregard the discharge of the duties of their state offices, devolved upon, them by the constitution and laws of the state and their official, oath, in order to perform, such labors and services as the federal government thus saw fit to impose upon them. No argument but a simple statement of the case is necessary to satisfy any lawyer-that Congress had no power to impose any duties upon state functionaries, for the surrender of fugitives, even if the federal government had, and the states had not, the power to legislate on the subject.
There is another consideration noticeable with regard to the fugitive act of 1793. That act was reported by the same Congress that passed the first act to incorporate the Bank of the United States,' and composed for the most part of some men with the preceding Congress which ^passed the practice act of September 24, 1789, prescribing in certain cases as well the duties of judges of the' state judiciary as that of judges of the federal judiciary. It was a Congress also of the same political character, and many of the same members, with a subsequent Congress which passed the acts respecting aliens and seditious persons. Indeed, one of the first laws-passed by the federal government under the constitution, assumed to prescribe the oath to be administered to the members of the several state legislatures, and the official oath of all executive and judicial officers of the several states, as well as of the federal government. Much of this kind of legislation, and some of which was so-extremely offensive as to have prompted Mr. Madison and Mr. Jefferson to remonstrate against it, is to be found among the early statutes of Congress. It is well known that the exercise by Congress of what they termed unwarranted powers, in the passage of the act to incorporate the bank, and the act respecting alien enemies, etc., induced Mr. Jefferson and Mr. Madison to introduce into-the legislatures of the States of Virginia and Kentucky the famous-resolutions of 1798. And while the great ability and patriotism of the prominent men in those early Congresses can not be questioned, their political views evidently inclined them to accord much larger powers to Congress than at a later period were claimed by their successors of similar political views to have been delegated under the constitution. Still another, and perhaps the strongest reason to he assigned for the exercise of doubtful powers by Congress and. a passive acquiescence by the people, was the novelty of limited legis *206 Native powers. The people, and especially the legal profession of this country, had acquired the habit of looking to the English Parliament as the great exemplar of legislative bodies. The omnipotence -of Parliament had long been a maxim. The force and obligation of its enactments as law, however unjust, were, for the most part, no more questioned than the legality of a constitutional provision. *Even as lato as 1807-08, it is well known as a part of the 'history of this state, that'our legislature, by a committee, reported -articles of impeachment against the eminent judges of the common pleas and of the Supreme Court of this state, who had, in the ■discharge of their official duties, decided against the constitutionality of the act of 1805, defining the duties of justices of the peace. "The judges were duly summoned, and appeared before the senate, sitting as a high court of impeachment. They admitted that they had decided the statute to be unconstitutional and void, and that they still remained of the same opinion; asserted the purity of their motives and the uprightness of their judicial conduct. And yet, although the motives and honesty of the judges were not impugned, the vote of the senate was fifteen for conviction against nine for acquittal. This incident in the judicial history of our own -state is quite illustrative of the great deference, in the early period of our governments, to statutory enactments; and especially would this deference be naturally entertained toward the federal legislature, which many were disposed to regard as possessing position .-and powors still more nearly resembling those formerly held by 'Parliament toward the colonics.
It should also be remarked that the fugitive act of 1793 seems not to have been called into use, or to have attracted any particular .attention for many years after its passage. And then, when it was occasionally used, it seems to have been, in a manner, generally free from that outrage upon the state police authority which char.-aoterizes the provisions and operation of the fugitive act of 1850.
I submit, therefore, that when all the facts and circumstances of •legislation, both by the federal and state governments, for the surrender of fugitives, are considered, they tend rather to show the power remaining with the states than to have been delegated under 'the constitution to the federal government.
* Again, we are referred to a number of adjudications in -state tribunals as indicating an acquiescence and recognition of the ■■constitutionality of the act of 1793. But the cases referred to. ox *207 some of them at least, arose under the act where state officers were the official agents to execute the law. The case of Hall v. Deacon, 5 Serg. & Rawle, 62, was one in which a justice of the peace had given the certificate under the act of Congress. The only question in that case, made to or decided by Chief Justice Tilghman, was whether the case came within the law of Congress, and not whether the act of Congress came within the provisions of the constitution. And the same observation applies to the case of Jack v. Martin, 12 Wend. 311. The recorder of the city of New York was the acting •officer in that case to execute the act of Congress. Ho issued his warrant for the arrest, heard and adjudicated the case, and gave a certificate for the removal of the fugitive under this act of Congress. From the opinion of Justice Nelson in the case, it would seem he felt somewhat embarrassed with the idea of the state having lost the legislative power over the subject, and finally disposed of it by referring to the fact of the act of Congress being only four years later than the adoption of the constitution, and presuming that the members of Congress must in some way have then seen, what he now could not, how Congress derived such legislative power from the states. But Judge Nelson does not feel embarrassed with the consideration that the federal government had no authority to direct state officials. The argument that the act of Congress remained in force, and was generally acquiesced in for fifty or -sixty years, is just as strong to show that Congress has the power under -che constitution to prescribe the duties and direct the action of state .officers, her governors, judges, and justices of the peace, as it is to show Congress has the power to legislate for the rendition of fugitives. The truth is that the acquiescence in the manner and ■under the circumstances, proves nothing. If it were a boundary •^question between two individuals, perhaps something might - be inferred from the length of time in favor of a party. But even rights claimed by prescription, it must be remembered, are only .allowed to an individual upon the supposition of the loss of an actual grant of the right. The party must have had a.continuous and exclusive enjoyment of the right. In this case Congress still holds her actual grant of powers, the constitution. She has not, and never could have acquired any powers except those granted by the .constitution. The obligation of the act of 1793 upon the states was disputed in 1842, the first time ever assorted before the Supreme «Court of the United States, and Chief Justice Taney then admitted *208 that the states still retained the power to legislate for the rendition of fugitives. Up to that time nearly every state had claimed and exercised the right of legislating upon the subject. So that the length of time would amount to nothing as between two individuals, the adverse claims in that regard being equal between the parties.
But it has been well observed by an eminent statesman that a century for a nation is but a day for an individual. This is only the commencement of our history. The constitutional limitations of power between the state governments and the federal government are yet, to a great extent, open questions. In the very recent, case of Dred Scott v. Sanford, 19 How. 432, the court enter fully into the consideration of the act of 1820, for the admission of the State of Missouri, and the power exercised by Congress to prohibit, slavery in the territories, a right exercised by Congress at that time for near seventy years. Chief Justice Taney, in pronouncing-the opinion of the court, says : “ The difficulty which meets us at. the threshold is whether Congress was authorized to pass this law (that of 1820) under any powers granted to it by the constitution;. for if the authority is not given by that instrument, it is the duty of this court to declare it void and inoperative.” The inquiry by that court was not how has or how has not the *question been. decided in some other courts, or oven by that, court, but the language of the court is consistent with the judicial oath under which-that court and this are alike required to meet and pronounce upon such constitutional questions. “ If the authority is not given (to' Congress) by that instrument (the constitution), it is the duty of this court to declare it void and inoperative.” I regard it, therefore, as idle to attempt to put by the question on the ground that, the act of Congress passed in 1793 was not questioned in some-other eases, and in some other court without this state.
I am not aware that the question, whether the power to legislate-for the rendition of fugitives from labor, under the constitution,, belonged to the federal or stato government, has ever been fully considered by the Supreme Court of the United States, except in one case, that of Prigg v. Pennsylvania, 16 Pet. 539; and that caso was really one in which the question was not properly before the court. Their opinion as given,-therefore, in the case upon this question,'was a mere obiter dictum, or rather obiter dicta; for their opinions, as then expressed, are various and discordant.
*209 The facts of that case, and the question submitted to the court, are simply these: Edward Prigg, with certain others, his associates, had been indicted and convicted before the court of quarter sessions of York county, in the State of Pennsylvania, in May,'1839, for forcibly taking a negro woman, Margaret Morgan, and her children, and forcibly removing them out of that state into the State of Maryland, contrary to the provisions of an amendment of the Statute of 1780, of Pennsylvania, passed March 25, 1826, entitled “ An act to give effect to the provisions of the constitution of the United States, relative to fugitives from labor, for the protection of free people of color, and to prevent kidnapping ” The verdict found that the allegations in the indictment that the accused “ did take, remove, and carry away said negro woman, Margaret Morgan, *and her children, mentioned in said warrant, out of this state into said State of Maryland, and did then and there deliver the said woman and children into the possession of Margaret Ashmore,” was true; and the jury, having so returned a verdict of guilty, the court gave judgment on the verdict against the accused. The verdict, by agreement of counsel, was a special one, showing the negro woman to have been a fugitive slave of said Margaret Ashmore, and that one of her children so taken and carried away with her was horn in the State of Pennsylvania more than a year after said negro woman had fled from Maryland, and became a resident in Pennsylvania ; and that the accused acted as the agent, and' by the authority of said Margaret Ashmore, in seizing and carrying to her the woman and children. The case was taken to the Supreme Court of Pennsylvania; and by that court the judgment was affirmed. And from the judgment of affirmance by the Supreme Court of Pennsylvania, the case was brought, by writ of error, before the Supreme Court of the United States, under legislative provisions for that purpose. The question thus presented to the court was whether, by force of the provision of the constitution, Prigg, as the agent of the owner of the fugitive slave, had the right to seize her and her children without process, and remove them to Margaret Ashmore, in Maryland, from whom the negro woman had fled.
The special verdict showed the removal of the negro woman and her children to have been neither under the law of Congress, nor in accordance with the law of Pennsylvania. The sole question, therefore, was whether the provision of the constitution, independent of any legislation by Congress, justified such removal; *210 and eight of the nine judges held affirmatively upon this proposition. And all the'judges, except Justices Catron and McKinley, took occasion, seriatim, to express an opinion respecting the power of Congress to legislate, as well as respecting the power •of the state governments. In the first place, Judge Story, delivering the opinion of the court, held that the *owner of a fugitive slave might pursue and recapture him in another state, and remove such fugitive to the state in which he had been held as a slave, by virtue of the provision in the constitution, independent of any legislation by Congress; and that consequently the statute of Pennsylvania, under which the accused was convicted, being in contravention of this constitutional right to remove the negro woman, the statute, as respects her removal, was inoperative and void. And this finding and holding, so far as the conviction for removing the negro woman was concerned, disposed of the case. And the conviction for kidnapping the children is not spoken upon by one of the judges, whether under the maxim de minimis non curat lex, or for some other reason, we are left to conjecture. For it is certain, however guarded the statement of the case as reported, the record discloses that the conviction and sentence submitted to the Supreme Court for revision was for that said Prigg, etc., in the language of the record, “ did take, remove, and caiuy away the said negro woman, Margaret Morgan, and her children,” etc. All, therefore, said ujxon the cases by the judges, beyond aixd after finding the statute of Pennsylvania void, as to the taking away the negro woman, in relation to her taking, was only obiter dicta. And yet, strange as it may be, these obiter dicta are the only arguments or reasons that eminent tribunal has ever deigned to give in favor of the right of the federal government to legislate on the subject. And this fact is even more strange when, as has ali’eady boon observed, those reasons and opinions of the different members of the court, thus expressed, wore so utterly discordant.
By limiting himself in his own words to considerations exclusively belonging to the case, “ and without laying down any rules •of interpretation of a more general nature,” and by a disregard of rules wliich he had before expressed, Judge Story was able to find that Congress not only had the right, but the exclusive right, to legislate for the ^rendition of fugitives. He also held that •state officers might, if they chose to do so, act under the law of •Congress. 16 Peters, 622.
*211 Chief Justice Taney held that both Congress and the state legislatures had power to legislate for the rendition of fugitives. “ I think,” says he, “ the states are not prohibited from legislating, but on the contrary, it is their duty to pass laws enforcing the rights of the slave owner.” Id. 627.
Mr. Justice Thompson expressed his dissent from the views of Judge Story upon similar grounds; holding that the states held the power as well as Congress to legislate upon the subject. Id. 635.
Mr. Justice Baldwin, in his opinion, said: “ I concur in reversing the judgment of the Supreme Court of Pennsylvania, as the removal could not be kidnapping, the slavery being acknowledged. But I dissent from the principles laid down by the court as thegrounds of their opinion.” Id. 636.
Mr. Justice Wayne expressed himself as concurring in the opinion expressed by Judge Story.
Mr. Justice Daniel concurred in the reversal, but dissented from the principles and reasoning of the majority, and expresses himself thus: “ There is a class of powers originally vested in the states, which, by the theory of the federal government, must have been transferred to the latter, which Congress may or may not enforce, either in whole or in part, according to its view of policy or necessity, or as it may find them for the time beneficially executed, or otherwise, under the state authorities. These are not properly concurrent, but may be denominated dormant powers in the federal government. They may, at any time, be awakened into efficient action by Congress,-and when called into action, will displace the powers of the states.” Id. 652.
Mr. Justice McLean expressed himself as differing on one point-from the opinion as pronounced by Judge Story *and so proceeded to state his views. After stating the fact that the clause of the constitution relating to fugitives had then, for the first time, come before the court for consideration,' he proceeded to say, that the power to legislate for the rendition of fugitives belonged exclusively to the federal government. He insisted it was “ essential to the uniform efficiency of this constitutional provision that it should bo considered exclusively a federal power.” “ It is,” continues he, “ in its nature as much so as the power to regulate commerce, or that of foreign intercourse.” Id. 662. He also expressed the opinion that “ although, as a general principle, Congress can not impose *212 duties on state officers, yet, in the ease of fugitivos from labor and justice, they have the power to do so.” Id. 665.
The learned judge does not inform us, however, what clause of the constitution it is, which, in addition to the special and incidental powers delegated, transfers from the states to the federal-government power because it is “ in its nature” one which the federal government could exercise. Nor does he inform us how the state executive should bo dealt with, in case he should refuse to-leave the discharge of his executive duties to discharge the duties imposed upon him by an act of the federal legislature.
The case was argued with surpassing ability. The main question — that of power in Congress to legislate upon the subject — was one of vital importance to the state. And if that court saw fit totueat of so grave a question when not properly before them, certainly it was due to both the court and the ease, that it should be according to strict and well-established rules of law. This was a question of far more importance to the state government than even one of property. It could not so injuriously imjiair the sovereignty of the state to wrongfully deny by judicial judgment her right of territory as to wrongfully deny her title to an important police power rightfully belonging to her. Here, then, was the grave question — a conflict of claim between the federal government and a state government to an important ^governmental power — . the federal government claiming that the state, under the constitution, had delegated the power to Congress, and the state denying the claim of the federal government. This, then, was precisely the question treated of by Judge Story in his Commentaries upon the Constitution, and for which he expresses this rule: “ Whenever it is a question of power, it should be approached with infinite'caution and affirmed only upon the most persuasive reasons.”
In this case, the only claim of power on the part of the federal government was by title derived from the states. Unless such title-was clearly shown by the federal government, it could not then properly be affirmed bythecourt. Let us, then, see these “most persuasive reasons,” as expressed by himself, which induced Judge Story to hold that the power to legislate had been so acquired by Congress.
The 18th clause of section 8, of article 1, provides that Congress, in addition to the special powers delegated, shall have power “to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested *213 .by the constitution in the government of the United States, or in any department thereof.” But Judge Story, in his Commentaries (sec. 1238), in speaking of this provision, says : “ The plain import •of this clause is, that Congress shall have all incidental and instrumental powers necessary and proper to carry into execution all the •express powers. It neither enlarges any power specifically granted, nor is it a grant of any new power to Congress.”
Add to these opinions and rules, expressed and laid down by Judge Story in his Commentaries upon the Constitution, that which he also expressed, that the federal judiciary was the proper common arbiter in all such conflicting claims of power between that government and the state governments (sec. 375), and certainly it would not seem unreasonable to expect a very clear showing .by him of title on the part of the federal government to the legislative *powor for the rendition of fugitives, before so deciding. But in the absence of any attempt to show a delegation of this power by the states under the constitution, except by reference to the clause conferring incidental powers, and hereafter alluded to, Judge Story thus settles the controversy between the state and .federal government: After reciting the clause, “no person held to service,” etc., the learned judge proceeds to state his reasoning as a “ common arbiter,” to show that the states, under the constitution, had in fact delegated the power to legislate in relation to such persons to the federal government. In the first place, Judge Story says: “We have not the slightest hesitation in holding that, under and in virtue of the constitution, the owner of a slave is clothed with entire authority, in every state in the Union, to seize and recapture his slave, whenever he can do it without any breach of the peace, or any illegal violence.” But, inasmuch as it is also stipulated in the provision of the constitution that the fugitive shall not be discharged by the legislation of the state into which he may flee, “ but shall be delivered up on claim of the party to whom such .service or labor may be due,” the judge thinks legislation may be necessary. And this is his reasoning to show which government has the power of legislation: “ If, indeed, the constitution guarantees the right, and if it requires the delivery on claim of the owner (as can not well be doubted), the natural inference certainly is that the national government is clothed with the appropriate authority .and functions to enforce it.” No clause of the constitution is reierrod to under which this high sovereign power had been dele *214 gated by the states and acquired by the federal government. ■ But it is certainly obvious that at the time this compact and undertaking in relation to fugitives was made by the State of Pennsylvania, and the other states, that state had, and the federal government had not, the legislative power over the subject.of fugitives within that state. It is also patent on the *face of the constitution that, “the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.” Amendment, art. 10. And yet, without, pretending to point out any clause of the constitution by which this power, admitted to belong to the state, has been delegated, or the state prohibited exercising it, we are told that “ the natural inference certainly is that the national government is clothed with the appropriate authority.” I confess that to my mind — when it appears that the state had, and the federal government had not, the legislative power — the natural inference would rather have been that the state, as the party having the power, rather than the federa], government, the party having it not, was “ clothed with the appropriate authority” to exercise the power. And especially should I have supposed this to have been the understanding of the framers and the adopters of the constitution, from a fact in'contemporaneous history, to which Judge Story makes n o allusion. For more than a hundred years immediately preceding the adoption of the constitution, the colonies and states had respectively exercised and received offices of kindness by comity in relation to the recapture and restoration of fugitive servants and apprentices, in a manner perfectly satisfactory to each other, and to the citizens of each. At least there is no evidence of any complaint having been made to the contrary, either at the formation of the articles o’f confederation, or in the constitutional convention. If, then, this long-established and satisfactory mode of reclaiming persons. escaping from their masters was to be changed, instead of -merely continued, by a. stipulation having apparently only that effect, it is passing strange that it should be done, not only without a single reason for the change uttered in the convention or out of it, but merely sub silentio, and without any intimation in the constitution itself of the power being transferred from the states.
But the most extraordinary of all those opinions are *those-of Judges Story and McLean, holding not only that Congress had the power to legislate, but that it was exclusive; and thus insisting *215 upon what Chief Justice Taney would not assent to, that the states were utterly stripped of this power, indispensable as a police power to preserve the peace, liberty, and safety of their own citizens.
Judge McLean does not very clearly state the process of reasoning by which he arrives at such a conclusion. He says, after reciting clause 3 of section 2, article 4, “ no person held to service,” etc., that the question whether the provision . . . “ vests the power exclusively in the federal government . ... must be determined from the language of the constitution and the nature of the ■ power ” (Id. 660) ; and that, thereby, “ the states are inhibited from passing any law or regulation which shall discharge a fugitive,” etc., and that a positive duty is enjoined upon them to deliver him up “ on claim of the party to whom his service may be' due and that “the nature of the power shows that it must be exclusive.” Id. 661.
Now, mark this reasoning of the learned judge:
1. The states are inhibited by the constitution, not from legislating generally on the subject, but from passing “ any law or regulation which shall discharge a fugitive.”
2. “A positive duty is enjoined on them” (the states) “to deliver him up.”
3. The conclusion — therefore “the nature of the power shows that it must be exclusive ” of the states — er, in other words, the states have no power to perform the duty thus enjoined on them. For it is obvious that the states can only perform the duty by passing a law to execute it.
I have thus stated the argument of the judge in his own language. It is the only reasoning, in its simple statement, by which he arrives at his conclusion. It is true, he attempts to fortify it by urging his want of confidence in the integrity, patriotism, and good faith on the part of the citizens of the several states. He informs us that in his ^opinion, “ the necessity for this provision was found in the views and feelings of the people of the states opposed to slavery,” and tells us that to have left" the effective power in the hands of those on whom it is to operate, . . . would show an inexperience and folly in the venerable framers of the constitution.” But all this does not qualify the reasoning of the judge, in arriving at his conclusion, that the powers of legislation was, by the terms of the clause, delegated by the states to the federal government. Nor would it qualify or aid the defects *216 of his logic, even if what he assumes were true, that the object of the convention of “ the venerable framers of the constitution ” was to aid and secure the despotism of slavery, instead of “to establish justice- .... and secure the blessings of liberty to ourselves and our posterity.”
But the opinion of Judge Story, by adopting the subtle and ingenious argument of the able counsel, is not so apparently void of plausibility. And yet the argument resorted to, while it should be entitled to the credit of some ingenuity on the part of counsel, under necessity to represent the advocacy of an infeasible proposition, is utterly unsound and fallacious.
Judge Story, at the commencement of his opinion, gives evidence of the almost insurmountable difficulties which his extensive learning brought before his mind, and to be surmounted in arriving at tbe conclusion determined upon, in order to effect what the constitution had failed to do — to transfer from the state governments to the federal this important police power. Hence he states, at the outset, that “in order to clear the case of difficulties, . . . in the exposition of this part of the constitution, we shall limit ourselves to those considerations which appropriately belong to it, without laying down any rules of interpretation of a more general natureor in other words, finding that the ordinary rules of interpretation would necessarily lead to the undoubted conclusion that the power belonged to the states, they determine to disregard and repudiate general and *long-established rules, and to decide the case by a rule appropriated solely to that cause. And whatever may Be said of the opinion in this particular, the judge strictly adhered to the novel proposition, and apjdied rules never before applied to the exposition of that or any other clause of the constitution.
This is the suggestive argument submitted to the court by Mr. Meredith: “ The constitution declares that slaves escaping from service shall be delivered up on claim to the person to whom such service shall be due. The words ‘ on claim’ look to-a proceeding of a judicial character, the assertion of a right of property to be made before a tribunal competent to judge and decide. Is not this, then, a part of the judicial power which extends to all cases in law and equity, arising under the constitution, laws, and treaties of the United States? If, then, the judicial power extends to cases falling within this provision of the constitution, Congress had an unques *217 ■tionable right to vest it. . . . The act contemplates a summary proceeding, but still of a judicial character.”
How far Judge Story has adopted this adroit but sophistical argument will be seen by comparing the two. After reciting the clause “no person held to service,” etc., Judge Story thus states his reasoning: “ It says, ! but he (the slave) shall be delivered up on claim of the party to whom such service or labor may be due.’ . . . A claim is ... a demand of some matter, as a right made by one person upon another to do, or to forbear to do, some act or thing as a matter of duty.” The manner and circumstances ■of delivering up the'fugitive, he next suggests, “ require the aid of legislation.” . . “ And the natural inference is, that the national government is clothed with the appropriate authority and functions to enforce it.” . . “When a claim is made by the owner,” he •continues, . . “it must be made against some other person,” . . “ and . . it constitutes a case ‘ arising under the constitution,’ within the express delegation of judicial power given by the ^instrument. • Congress may then call that power into activity for the very purpose of giving effect to that right.”
It is unnecessary to say how far the ingenuity of this argument, as suggested by the counsel, is dependent upon its obscurity; but it is certain that just in proportion as the argument is made fully comprehensible, its sophistry, and, I may say, absurdity, becomes apparent. The remark, in Chief Justice Taney’s opinion, upon this reasoning of Judge Story, shows very clearly its unsoundness. “ There are other clauses in the constitution,” says the Chief Justice, “ in which other individual rights are provided for and secured in like manner.” . . “ Thus, for example, the constitution provides that no state shall pass any law impairing the obligation of contracts. This, like the right in question is an individual right, placed under the protection of the general government; and in order to secure it, Congress has passed a law authorizing a writ of error to the Supreme Court,” etc. “ Again, the constitution of the United States declares that1 the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.’ ” . . “ And although these privileges and immunities, for greater safety, are placed under the guardianship of the general government, still the states may, by their law and in their tribunals, protect and enforce them. They have not only the power, but it is their duty, which they aro bound to perform. The individual *218 right, now in question, stands on the same ground, and is given in similar words, and ought to be governed by the same principles.” 16 Pet. 628, 629. And nothing can be more evident than that all ■these covenants or compacts of the constitution, as thus stated by Chief Justice Taney, stand on the 11 same ground.” If the states have delegated their power, by implication merely, to legislate as to any one of those subjects of compact, they have as to all. Apply) therefore, the reasoning of Judge Story, and the states could pass no law upon the subject of contracts, nor in relation to the rights of citizens of other states *within the state so legislating, nor, in short, for the exercise or discharge of any duty arising under tho constitution. And by like reasoning, it must follow that if Congress can arrogate to itself, without any express delegation of power under the constitution, authority to legislate for the fulfillment of one of the stipulations by the states, it has power to legislate for the fulfillment of all. In that case, Congress, and not the state legislatures, has the power to legislate respecting contracts in the states; Congress, and not the states, has the power to legislate to secure the rights and immunities of citizens coming from another state, irrespective of color or condition; and Congress, too, has the power to legislate, under the reasoning of Judge Story, ■for the enforcement of that important compact, among others, that “no person” shall “be deprived of life, liberty, or property without due process of law.”
Bat the soundness of this argument seems to have appeared sufficiently questionable to the counsel proposing it to the court, to have induced him to submit it as a query, rather than as an argument commanding his own full assent.
The fallacy of the argument consists, evidently, in assuming that the power given by clause 18 of see. 8 of art. 1, “to make all laws which shall be necessary and proper for carrying into execution the . . . powers vested” in the judiciary, authorized Congress to legislate, in their own discretion, upon any subject named in the constitution, in order to give more extensive employment to the judiciary.
And Judge Story has, himself, as already remarked, given judgment against his reasoning, as follows:
“The plain import of this clause (18 of sec. 8, art. 1) is, that Congress shall have all incidental and instrumental powers necessary and proper to carry into execution all the express powers. It *219 neither enlarges any power specifically granted, nor is it a grant of any new power to Congress.”
Indeed, in all his extensive writings upon the constitution,. *Judge Story had never, either in the text, note, or index, even intimated that he supposed the states had over delegated, or the federal government acquired, any power to legislate for theren-! dition of fugitives from service. And the allusion made to Mr.j Madison as authority for such assumption of power in favor of the federal government, by the extract, in his opinion, from No. 43 of the Federalist, is unfortunate. The extract is as follows: “ A right implies a remedy, and where else would the remedy be deposited by the constitution?” It will be seen by referring to No. 43 of the-Federalist, that the remark was made by Mr. Madison in commenting upon the express provision of the constitution — sec. 4 of art. 4. And though the entire powers delegated under article 4, containing-this very fugitive clause, are fully considered by Mr. Madison, he makes no intimation of the possibility of the federal government ever claiming or arrogating to itself any power under this fugitive clause. The reference was certainly unfortunate.
The limitations imposed upon the legislative powers of Congress are correctly stated by Judge Story, in that ease, as follows: “No one has ever supposed that Congress could constitutionally, by its legislation, exercise powers or enact laws beyond the powers delegated to it by the constitution.” “ But,” he adds, “ it has on various occasions exercised powers, which were necessary and proper, as-means to carry into effect rights expressly given and duties expressly enjoined thereby.”
What I have to say to that is, that if the judge means, by “rights-expressly given and duties expressly enjoined thereby,” rights and duties “expressly given and enjoined” upon the federal government, or any department or officer of the government, the constitution, by clause 18 of sec. 8, art. 1, expressly delegates to Congress-power “ to make all laws which shall be necessary and proper for carrying into execution” not only the “foregoing powers” specified in sec. 8 of art. 1, but also “all other powers vested by *this constitution in the government of the United States, or in any department or officer thereof.” Thus, the constitution having delegated power to Congress to make treaties, and to havh its members (senators and representatives) free from arrest, except in cases of treason, felony, and breach of the peace, ample power is given; and- *220 it is the unquestionable right of Congress to exorcise the power to “ carry into execution and give effect to all such powers delegated to any department of the federal government,” and the same as to .all officers of the federal government. But if, by “ rights expressly .given and duties expressly enjoined,” the judge means rights and •duties expressly enjoined upon the states or any citizen thereof, •Congress never has received, and never can exercise, the power of legislation to carry the same into effect, except by sheer usurpation .and utter disregard of the express provisions of article 10 of the amendments of the constitution. It is not pretended in the opinions •expressed by Judge Stol-y, or by either of his associates, that any power is delegated, or even any right or duty expressly given or ■enjoined by the constitution, in relation to fugitives from service, upon the federal government, or any department or officer thereof.
The constitution has expressly provided that Congress may “ pro-wide for the punishment of counterfeiting the securities and current coin of the United States," and certain other offenses particularly •specified. But all of those are of infinitely less importance to the state sovereignties than is the power arrogated to the federal gov•ernment and denied to the states, in the absence of any exjxress provision of the constitution, by the doctrine laid down in their -opinions in that case.
After the most careful examination, I am convinced, beyond any .reasonable doubt, that the case of Prigg v. The Commonwealth of Pennsylvania is not a correct exposition of the law. On no principle of rational construction recognized by common' law or sound reasoning, or by *any rules of judicial decision, is it thereby .shown that Congress has any power, under the constitution, to legislate for the reclamation of fugitives from service.
The power thereby asserted for the federal government is one of such tremendous importance and of such vital interest to the states .-as to justify a somewhat minute examination of the only decision ■in which the subject has been considered by the Supreme Court of the United States. For, although the question as to the power of Congress to legislate did not necessarily arise in that case, that ■court have over since relied upon the opinions then given as conclusive.
When the Question as to the power of Congress was afterward, in the case of Jones v. Van Zandt, 5 How. 213, directly presented to •■the same court, and the point argued at much length, the court re • *221 fused to again consider the question. They merely say, “ That this-act of Congress” (the act of 1793) “is not rupugnant to the constitution, must be considered among the settled adjudications of this court.” And in the case of Abloman v. Booth, the certified opinion in which has been furnished us by counsel in this case, the-question is treated with still less respect. The question of power arose, it is true, under the same clause of the constitution; but it was in relation to the power of Congress to pass the fugitive law of 1850, containing, among other atrocious provisions, the section hereinbefore recited. And the following is Chief Justice Taney’s-opinion, and his whole opinion, when a sovereign state, which had not before been heard as to her right to exercise the power, had, by her Supreme Court, asserted the right. The chief justice does not. even devote a single paragraph to dispose, with ordinary respect of the decision of the Supreme Court of a state to the contrary. He remarks, in the middle of a paragraph, as follows : “ It is proper-to say that, in the judgment of this court, the act of Congress, commonly called the fugitive slave law, is, in all its provisions, fully authorized by the constitution of *the United States.” Such is the brief but decided expression of approval by that court of the fugitive act of 1850 — an act which, in utter disregard of the limitations imposed by the constitution upon the powers of the federal government, lays the ax to the roots of state sovereignty, and, by its flagrant provisions against the rights and liberties of the citizens of the states, has, perhaps, not been surpassed in enormity since the repeal of the edict of Nantes by Louis the Fourteenth.
Whether an utter disregard for the rights and decisions of the-supreme judiciary of a sovereign state had more influence than considerations of self-respect, to avoid another exhibition of such-legal and constitutional reasoning and variety of discordant opinions as expressed in the Prigg case, is quite immaterial: But it is-evident that the federal court has chosen to rest the claim of power-on the part of the federal government to enact the fugitive act óf 1850, as well as that of 1793, upon the “ reasoning,” as it is termed, in the Prigg case. And that fact, with the incalculable importance of the question to the independence of the states, I deem an ample explanation for the consideration here given that case. I here take leave of the legal questions presented in that decision.
But there is still another view in which the opinions pronounced in the case of Prigg v. The State of Pennsylvania, ought to be- *222 ■considered. The sentiment, expressed in those opinions, in favor •of the power of legislation respecting fugitives being exercised by the general rather than the state governments, seems to have impressed the judges with the necessity of the conclusion to which they arrived. And this question of polity, doubtless, had not.less influence than the question of law, in enabling the judges to find the power to belong to the federal, rather than the state governments, under the constitution.
The opinions expressed, that the power to legislate for the ren-dition of fugitives belongs to the federal government, and not to the states, I have already shown, are *not in accordance with legal rules, and are opposed to the express provisions of the ■constitution, affirming that the powers “not delegated .... are reserved to the states.”
But the opinions, in fact, rest upon grounds rather political than legal. And it shall now be my purpose to show that the opinions pronounced by the members of the Supreme Court in the Prigg ■ease, and by the chief justice in the Booth case, are as utterly wrong politically, as they have been shown to be legally.
The opinions in those cases are obviously the result of the following political propositions, which that court assumed:
1. That the state governments were not trustworthy ; that neither the state legislatures, nor the state judiciaries, could be relied upon, under their official oaths, to discharge their constitutional ■obligations.
2. That the federal government, both in its legislative and judicial departments, was superior to those biases and human frailties which characterized the state governments, and was the only ■safe repository of the powers to faithfully and impartially execute the provisions of the constitution imposing duties upon citizens of the states, and the states also.
3. That those who framed and adopted the constitution of the United States, designed the general government to be a national •rather than a federal government; and that it should bo invested with not merely limited and enumerated powers, but with discretionary powers, to be so exercised as to obviate any necessity for the •amendment of the constitution, as therein provided for.
4. That the state governments were to be regarded as possessing, ¡under the constitution, only limited powers; and instead of being *223 co-ordinate governments, were strictly subordinate to the federal government.
5. That, acting toward the state governments with distrust, and toward the federal government in full confidence, the framers of the constitution, and the people who ^adopted it, intended that in all conflicting claims of power between the federal and state governments respectively, the federal government, either in its legislative or judicial department, should be the sole arbiter between itself and the state governments.
6. Another proposition, equally untenable, and opposed to the history of the adoption of the provision in relation to the surrender of fugitives, assumed by that court, is that the object of the provision was to secure to the owners of slaves a complete right and title to them as property, instead of persons, in the free states, “ and that the formation of the Union depended upon the insertion of the provision in the constitution.”
It is on the foregoing rather than upon any legal propositions, that their reasoning and conclusions in those cases seem to depend. And the court refer with apparent confidence to contemporaneous history in support of those extraordinary assumptions.
Without for a moment admitting the right to substitute history to annul or vary the plain language of the constitution, I refer with equal confidence to contemporaneous history, and deny that it .affords the slightest countenance to any of those assumptions.
I propose, then, without controverting those several propositions in the order stated, or separately, to consider them, to some extent, generally.
I know that it is urged by those disposed to regard the federal government as a national government, possessing, to some extent, general powers, and in all respects paramount to the state governments, that none of the states were in fact sovereign states prior to the declaration of independence. Yet, even if this were so, it would not follow that the federal government had any other or more general powers than those delegated to it under the constitution. If the general government and state governments had been both formed at the same time, by the same people, we should then be constrained to limit each ^government to the powers belonging to them respectively as expressed under the federal and state ■constitutions; and the result in this view would be a general gov■ernment of limited and enumerated powers, the limitations of its *224 powers being expressed by the constitution. But the fact is, New Hampshire, New Jersey, Yirginia, and South Carolina, had each formed an independent government, previous to the adoption of the declaration of independence. On the 29th day of June, 1776, Yirginia, in her convention of delegates, had declared “ the government of this country, as formerly exorcised under the crown of Great Britain, totally dissolved,” and proceeded to fora; a new constitution of government, as an independent sovereign state. New Hampshire had the December previous formed a government; and South Carolina in the March preceding, and Now Jersey on the 2d July, 1776, had each also adopted a constitution and form of government, to continue until a reconciliation with Groat Britain.
And again, whether the constitution of the United States be regarded as having been adopted by the several states merely as statesovereignties, and so existing by a solemn compact between them, and expressing the objects and powers of the federal government so-formed by the states; or whether it bo regarded as having been adopted by the people of the several states in their individual and personal capacities, as well as in their aggregate state sovereignties, I apprehend the character of the general government, and the-enumeration and limitation of its powers equally exist, and are to be determined by the provisions of the constitution. In either case, the existence, and powers, and purposes of the general government are derived and determined solely by the provisions of the constitution. The states wore respectively, in the common acceptation of the term, independent sovereign governments; at least separate and distinct communities, in which governmental powers were by them respectively jiossessed and independently exercised for the protection of the rights of the people. *of such communities or states. In this state of the case, it. seems unnecessary to consider the question whether the people of the states under their respective constitutions could, by a majority vote of the states respectively, adopt the proposed amendment of the articles of confederation expressed by the constitution of the United States, and constitute a general government, without thereby abrogating their state governments; or whether it required, necessarily, the action of the states, as states, for its adoption. In either case,, the people or the states, as the ease might bo, must nocessarity have made the operations of the federal government within its own sphere as prescribed by the constitution paramount to the state govorn *225 menta, in the same sense and to the same extent now provided, to wit, that the “ constitution and the laws of the United States made in pursuance thereof,” etc., “ should be the supreme law of the land.”
The difference between the general government under the articles of confederation and under the constitution is simply this: The action of the general government under the articles of confederation was upon the states as states, whereas under the constitution its action is upon persons for the most part, as persons merely. It is, under the constitution, in its operations, an independent government. It is not, like the government under the articles of confederation before amended, dependent upon state legislation to give its acts efficiency. It is neither auxiliary to the state governments, nor are they to'the federal government. Each acts independently, in its own sphere. And the federal government extending over all the states, however limited its powers might have been constituted, under the constitution, within such limitation, it would necessarily have been paramount, and the constitution, and the laws and treaties made in pursuance thereof, would have been the supreme law of the land.
No question arose in the constitutional convention which occasioned more anxiety and which gave rise to more full *discussion, and which was more carefully considered, than that of the division of powers between the federal and state governments. It was upon this question principally, that distinguished men differed in opinion. Upon this question the first political parties under the constitution arose.
In the first place, and before the convention assembled, Mr. Hamilton and others looked to the formation of a national government, and -were anxious in constructing it to give it large powers, apprehending its great danger to be dissolution. Their plan was to make a national government supreme and general, and leave the state governments subordinate in all the departments.
Mr. Jefferson and others, on the other hand, regarding the people as the source of political power, and government as only an instrument to secure their rights, wished to keep the government of the people in their own hands, and so favored the state governments, and looked with distrust to any removal of power from them.
This difference of opinion even manifested itself before the convention assembled. Those opposed to a national government, would *226 ■■only consent to call a convention to amend the articles of confederation. The convention was called, and assembled for that purpose, under the following resolution, passed by Congress, February 21, 1787 : “ Resolved, that in the opinion of Congress it is expedient that on the second Monday of May next, a convention of delegates, who shall have been appointed by the several states, be held in Philadelphia, for the sole and express purpose of revising the articles of confederation, and reporting to Congress and the several legislatures such alterations and provisions therein as shall render the federal constitution adequate to the exigencies of the government and the preservation of the Union.” 1 Ell. Deb. 120.
In accordance with this resolution, the constitutional convention was called to meet on the second Monday of May, 1787 ; *but only convened in sufficient numbers to commence business on the 25th of May.
The members of that body in favor of a national government, at once urged the necessity of making the state governments subordinate. Hence the first plan for the amendment of articles of the confederation, submitted May 29th by Gov. Edmund Randolph to the convention, contained a provision to grant to tbo federal government power to negative any acts of the state legislatures which Congress might deem contrary to the articles' so presented, or to any treaty under the Union. It also gave the power to the federal government to call forth the military and naval force of the Union against any state failing to fulfill its duties under the articles of such constitution. 1 Ell. Deb. 144.
Afterward Mr. Charles Pinckney submitted a plan, with a provision that Congress should have power to revise any laws passed ■by the states, which they might suppose infringed upon the powers ■exclusively belonging to the legislature of the United States ; and to negative and annul all such laws as they found inconsistent with ■such delegated powers. Id. 146.
Again, at a later date, June 15th, Mr. Patterson, another friend of Mr. Hamilton’s views of a national government, introduced and submitted his plan. It contains a provision that “if any state or body of men in any state should oppose or prevent carrying into ■execution such acts or treaties” (of the Union) “the federal executive shall be authorized to call forth the forces of the confederated -states, or so much thereof as shall be necessary to enforc or compel obedience to such act or the observance of such treaties.” Id. 177.
*227 Mr. Bandolph’s plan was afterward, in committee of the whole, so amended as to provide that the jurisdiction of the national judiciary should extend to all “ questions which involved the national peace and harmony.”
Mr. Hamilton also introduced his project, which, after declaring *all laws passed by any state contrary to the constitution .and laws of the United States null and void, provided that “ the better to prevent such laws from being passed, the governor or president of each state shall be appointed by the general government, and shall have a negative upon the laws about to be passed by the state of which he is governor or president.”
After the introduction of this plan by Mr. Hamilton, a motion was made by Mr. Pinckney to vest in the legislature of the United States the power “ to negative all laws passed by the several states, interfering, in the opinion of the legislature, with the general interest and harmony of the Union, provided that two-thirds of each house assent to the same.”
It is unnecessary to say more as to each of those several propositions, than that each was fully considered and finally rejected.
These propositions were introduced by the advocates of a strong national government, who regarded dissolution as the great danger. They were opposed by the friends of a limited federal government, who regarded consolidation as the great danger. The fact, however, that these several plans were all introduced and urged, in some way, to make the state governments subordinate to the federal government, either by giving the federal executive, the federal legislature, or the federal judiciary a controlling supervision over the state governments, and that each and all were rejected, is a significant fact. It shows, beyond all question, that the majority of that body were in favor of a federal government with limited powers, and utterly opposed to the state governments being subordinate to the limited government of their creation.
Again; it is well known that the opposition to the adoption of the constitution originated in the apprehension that if such a government was constituted, its tendency would be to arrogate to itself the power belonging to the state governments, and ultimately lead to the centralization *of all power in the federal government. This feeling was very general in the State of Virginia; upon the action of which state it was thought the adoption or rejection of the constitution, when submitted, mainly depended. *228 The importance of the question enlisted in its discussion, upon-each side, men of the highest order of ability and talent. The-principal topic of discussion was the danger of a largo augmentation of the powers of the federal government beyond what was expressed by construction or implication.
In the Virginia convention, Patrick Henry, George Mason,. James Monroe, and other distinguished men, strenuously objected to the ratification of the constitution. Particular objection was-made to the concluding clause of section 8, article 1, providing that Congress “shall have power to make all laws which shall be necessary and proper for carrying into execution the foregoing pbwei’S,” etc. Mr.-Madison, replying to the objection, said: “ With respect to the supposed operation of what was denominated the- ' sweeping clause, the gentleman was mistaken ; for it only extended to all the enumerated powers. Should Congress attempt to extend; to any power not enumerated, it would not be warranted by the-clause.” 3 Ell. Deb. 455.
Governor Randolph, who was also one of the framers of the constitution, in his remarks upon this subject in the convention, said: “ There is not a word said in the state governments of the powers-given to it because they are general; but in the general constitution-. the powers are enumerated. Is it not, then, fairly deducible that it has no power but what is expressly given it? For if its powers-were to be general, an enumeration would be needless.” He further proceeded to say that the negative restrictions upon Congress,, expressed in the constitution, are “ exceptions, not from general' powers, but from the 'particular powers therein vested.” Ho then proceeds to speak of each restriction, showing it to be an exception out of some express'y delegated power. Id. 463, 464.
George Nichols, in his remarks upon this subject, in the-*same convention, said: “ But it is objected to for want of a bill of rights. It is a principle universally agreed upon that all powers not given are restrained.” . . . “ In England, in all disputes between the king and people, recurrence is had to the-' enumerated rights of the people to determine. Are the rights in dispute reserved? Are they included in the magna charla, bill of rights? etc. If not, they are, generally speaking, within thokirig’s prerogative. In'disputes between Congress and the people the reverse of the proposition holds. Is the right enumerated t If not, Congress can not meddle with it. Which is the most safe?' *229 'The people of America know what they have relinquished for certain purposes. They also know that they retain everything else, and have a right to resume what they have given up, if it be perverted from its intended object.” Id. 246.
John Marshall, afterward Chief Justice of the United States, in ■speaking of the particular power of Congress over the militia, in•quired : “ Could any man say that this, power was not retained by ■the states, as they had not given it away?” “ For,” he asks, “ does not a power remain until it is given away ? For continental purposes, Congress may call forth the militia; as to suppress insurrections and repel invasions. But the power given to the states by the people is not taken away, for the constitution does not say so. In the confederation Congress had this power, but the state legislatures had it also. The power of legislating given them in the ten miles square is exclusive. AU the restraints intended to he laid on the state governments (besides where an exclusive power is expressly given to Congress) are contained in the 10th section of the 1st article. This power — the militia power — -is not included in that section.” Id. 419.
Again, speaking on the judicial powers delegated by the constitution to the federal government, Mr. Marshall says : “ Has the government of the United States power to make laws on every ■subject ? Does ho understand it so ? Can they make laws concerning the mode of ^transferring property, or contracts, or claims between citizens of the same state ? Can they go beyond the delegated powers ? If they were to make a law not warranted by any of the powers enumerated, it would be considered by the judges as an infringement of the constitution which they are to guard, . . . they would declare it void.” Id. 553.
But, according to the reasoning in the Prigg case, inasmuch as the states are prohibited passing any “ law impairing the obligation of contracts,” as well as from passing any law in “discharge of fugitives,” the federal government should do all legislation upon the subject of contracts as well as upon the subject of fugitives.
Finally, upon the conclusion of their deliberations, the convention of delegates of Yirginia, in their resolution of acceptance, very clearly expressed their understanding of the instrument. Their act of acceptance is as follows: “We, the delegates of the people of Yirginia .... having fully and freely investigated and discussed the proceedings of the federal convention, and being pre *230 pared, as well as the most mature deliberation hath enabled us to-decide thereon, do, in the name and in behalf of the people of Virginia, declare and make known, that the powers granted under the constitution, being derived from the people of the United States, may bo resumed by them whenever the same shall be perverted to their injury or oppression, and that every power not granted thereby, remains with them and at their will; that therefore no right of any denomination can be canceled, abridged, or restrained, or modified by the Congress, the senate, or house of representatives acting in any capacity, by the president, or any department, or officer of the United States, except in those instances in which power is given by the constitution for those purposes; and that among other essential rights, the liberty of conscience and the-press can not be canceled, abridged, or restrained, or modified by any authority of the United States. With these impressions, with a solemn appeal to the Searcher of hearts, for the ^purity of our intentions, .... we, the said delegates, in the name and behalf of the people of Virginia, do, by these presents, assent to, and ratify the constitution,” etc.
Two things are here evident:
1. That the delegates having, as they say, “fully and freely investigated and discussed the proceedings of the federal convention,’>■ they understood that the project to make the state governments subordinate to the federal government had been rejected. The “ px’oceedings of the federal coxxvention ” showed that the project of Mr. Eaxxdolph, to grant the power to Congress to negative state laws, and, as amended, to give the national judiciary a coxxtrolling power in certain cases over the state govcrnmexxts was rejected; and that in like manner the projects of Pinckney, Pattex'son, and Hamilton, each of which had for its object in some way to make the state govexuxments sxxbordinate to the federal goverixment, had all been rejected by the convention, leaving the state governments in all respects co-ordinate with the federal governnient.
In the second place, it is evident from the proceedings of the Virginia convention, that they ixxtended to guard against any possible augmentation of power’s to the federal government, by implication or construction, on the part of those who had beexx so strenuous ixx their endeavor to give large powers to the federal governmexxt, axxd make the state governments subordinate.
It is certain, therefore, xxot oixly that the coxxstitution does not, *231 by any provision therein expressed, make the state governments,, or any department thereof, subordinate to the federal government, or to any department thereof; but it is also evident that the proposition, in various shap'és, to subordinate the state governments to-the federal government, in its legislative, executive, or judicial department, was fully considered, and rejected by the framers of the constitution. It is moreover evident, that the proceedings of the-constitutional convention, in that regard, were known and considered by the states respectively, in determining *upon their adoption of the constitution. Nor can it be insisted that the strict construction of the constitution in favor of the reserved powers of the states was peculiar to the State of Yirginia. It is true, that, state proposed, at the time, the substance of her construction as an amendment: “That each state in the Union shall respectively retain every power, jurisdiction, and right which is not by the constitution delegated to the Congress of the United States or to the departments of the federal government;” but other states in their-conventions seem to have taken similar views and expressed like sentiments in relation to the constitution.
In the Massachusetts convention, Mr. Parsons, a friend to the constitution, and who, after its adoption, was known as an eminent, judge, and ether distinguished members, among whom wore Mr. Hancock, Mr. Adams, and Judge Sumner, and others, expressed similar views in relation to the limited powers of the federal government under the constitution with those expressed in the Yirginia convention. But such was the apprehension prevailing in that convention, that the general government might thereby acquire a control over the state governments so as to endanger their independent, sovereignties, that the president of the convention found it necessary to introduce into their resolution of acceptance an expression of their views of the constitution, and a recommendation to have the limitations upon the powers of the general government made still more certain by amendment. The convention of delegates of Massachusetts, accordingly, in their resolution to assent to and ratify the constitution, thus express their views: “And as it is the opinion of this convention that certain amendments and alterations in the said constitution would remove the fears and quiet the apprehensions of many of the good people of the commonwealth, and more effectually guard against an undue administration of the federal government, the convention do therefore recommend that the
*232 following alterations and provisions *be introduced into the said constitution: 1. That it be explicitly declared that all powers not expressly delegated by the aforesaid constitution, are reserved to the several states, to be by them exercised.” And various other amendments were also added, restrictive of the powers of Congress to the powers actually delegated, and enjoining upon the representatives of that state in Congress to insist upon such amendments. 2 Ell. Dob. 176, 177.
The State of South Carolina, also, in connection with the expression of their assent to and ratification of the constitution, added: “This convention doth also declare that no section or paragraph of the said constitution warrants a construction that the states do not retain every power not expressly relinquished by them, and vested in the general government of the Union.” 1 Ell. Deb. 325.
The acceptance hy the State of New Hampshire is, that “ the .convention having impartially discussed and fully considered the constitution for the United States of America reported to Congress, . . . do, in the name and behalf of the people of the State of New Hampshire, assent to and ratify the said constitution for the United States of America. And as it is the opinion of this convention that certain amendments and alterations in the said constitution would remove the fears and quiet the apprehensions of many of the good people of this state, and more effectually guard against an undue administration of the federal government, the convention do therefore recommend that the following alterations and provisions be introduced in the said constitution : 1. That it be explicitly declared that all powers not expressly and particularly delegated by the aforesaid constitution, are reserved to the several states, to be by them exercised.” Id. 325, 326.
In the ratifying convention of North Carolina, in his reply to objections made to the constitution that it contained *no bill of rights, Mr. McClain said: “ It would be very extraordinary to have a bill of rights, because the powers of Congress are expressly defined, and the very definition of them is as valid and efficacious a check as a bill of rights could be, without the dangerous implication of a bill of rights. The powers of Congress are limited and enumerated.....It is as plain a thing as possibly can be, *233 that Congress can have no powers but what wore expressly given them.” 4 Ell. Deb. 140, 141.
The president of the convention, Governor Johnson, in reply to the same objection (as reported on page 142), said: “The Congress can not assume any other powers than those expressly given them» without a palpable violation of the constitution.”
Judge Iredell, a member of the federal convention for framing the constitution, and one of the ablest men in the state, spoke to the same effect: ■“ Of what use, therefore,” says he, “ can a bill of rights be in this constitution, whore the people expressly declare how much power they do give, and' consequently retain all they do not? It is a declaration of particular powers by the people to their representatives for particular purposes. It may be considered as a great power of attorney, under which no power can be exercised but what is expressly given. Did any man over hear before, that at the end •of a power of attorney it was said the attorney should not exercise more power than was there given him ?”
In the convention of the State of Pennsylvania for ratifying the constitution, it was urged as an objection to the instrument that it •contained no bill of rights. Judge Wilson, who had been a leading member of the convention, and, next to Mr. Madison, perhaps the most active in framing the instrument, replied to the objection. In his reply, he uses the following language : “ It is urged as a general' •objection to this system, that the powers of Congress are unlimited and undefined, and that they will bo the judges, in all eases, of what is necessary and proper *for them to do.....To bring this subject to your view, I need do no more than point to the words of the constitution, beginning at the 8th section, article 1. I need not road over the words, but I leave it to every gentleman to say whether the powers are not accurately and minutely defined, as can well be done on the same subject in the same language. The old constitution is as strongly marked on this subject, and even the concluding clause, with which so much' fault has been found, gives no more or other powers, nor does it in any degree go beyond the particular enumeration ; for when it is said that Congress shall have power to make all laws which shall be necessary and proper, these words are limited and defined by the following: ‘For carrying into execution the foregoing powers.’ It is saying no more than that the powers which we have already particularly given, shall be effectually carried into execution.” 2 Ell. Deb. 468. *234 In the afternoon of the same day, he again says: “Whoever views the matter in a true light, will see that the powers are as minutely enumerated and defined as was possible, and will discover that the general clause against which so much exception is taken, is nothing more than what was necessary to render effectual the particular powers that are granted.....Can any cause of distrust arise here? Is there any increase of risk ? Or, rather, are not the enumerated powers as well defined here, as in the present articles of confederation ?” Id. 481, 482.
The following is the provision alluded to in the articles of confederation : Art. 2. “Each state retains its sovereignty, freedom^ and independence, and every power, jurisdiction, and right, which is not by this confederation expressly delegated to the United States in Congress assembled.”
In the New York convention objections were urged against the constitution that there would be danger of the state governments being made subordinate to the federal government. Mr. Hamilton, answering those objections, *took occasion to speak of the strict limitations of the powers of the general government; and denied that the federal government and the state governments would occupy any other relation under the constitution than that of co-ordinates. In the course of his remarks he said: “ The laws of the United States are supreme as to all their proper constitutional objects. The laws of the states are supreme in the same way. Suppose both governments lay a tax of a penny on an article; had not each an uncontrollable power to collect its own tax ? The meaning of the maxim, there can not be two supremos, is simply this : two powers can not be supreme over each other.” And again, in speaking upon the subject the next day, Mr. Hamilton, in the course of his remarks, expressed himself thus: “ I maintain that the word supreme imports no more than this: that the constitution and laws made in pursuance thereof, can not be controlled or defeated by any other law. The acts of the United States, therefore will be absolutely obligatory as to all the proper objects and powers of the general government. The states as well as individuals are bound by these laws ; but the laws of Congress are restricted to a certain sphere ; and when they depart from this sphere they are no longer supreme or binding. In the same manner the states have certain independent powers in which their laws are supreme. For example, in the making and executing laws concerning the punishment *235 of certain crimes, such as murder, theft, etc., the states can not be controlled. With respect to certain other objects, the powers of the two governments are concurrent and yet supreme.” ..." In. the first formation of government by an association of individuals, every power of the community is delegated, because the government is to extend to every possible object; nothing is reserved but-the inalienable rights of mankind ; but when a number of these societies unite for certain purposes, the rule is different, and for the-plainest reasons; they have already delegated their sovereignty and" their power to their several governments; *and these can not be recalled to give another, without an express act. I submit to the committee whether this reasoning is not conclusive.” 2 Ell. Deb. 361-363.
Mr. Smith said : “ Th¿ truth is, the states and the United States-have distinct objects. They are both supreme. As to national objects, the latter is supreme; as to internal and domestic objects, the-former.”
The State of 'New York by her convention of delegates in her acceptance of the constitution thus expresses her construction of the-instrument: “ That the powers of government may be resumed by the peojtle whensoever it shall become necessary to their happiness.. That every power, jurisdiction, and right, which is not by the said constitution clearly delegated to the Congress of the United States or the departments of the government thereof, remains to the people of the several states, or to their respective state governments to-whom they may have granted the same ; and that those clauses in the said constitution which declare that Congress shall not have or exercise certain powers, do not imply that Congress is entitled to any powers not given by the said constitution; but such clauses are to be construed either as exceptions to certain specified powers, or as-inserted merely for greater caution.” 1 Ell. Deb. 327.
Rhode Island with her acceptance and ratification of the constitution, proposed and insisted upon the following, with other amendments : “1. The United States shall guarantee to each state its sovereignty, freedom, and independence, and every power, jurisdiction, and right which is not by the constitution expressly delegated to-the United States.” Id. 336.
And these proposed amendments limiting the federal government, strictly to the powers actually delegated, and leaving the sovereignty of the states intact, except as to the powers so delegated,. *236 -were substantially adopted as expressed in article 10, of the amendments of the constitution.
*No record has been preserved of the proceedings of the State of-Georgia in the ratifying convention of that state. But it is evident from the construction that state seemed to put upon the provisions of the constitution, immediately after its adoption, that the instrument was regarded by that state as conferring only limited and enumerated powers upon the federal government; and that the two governments, state and federal, were strictly co-ordinate.
At the August term, 1792, an action was brought, in the Supreme ■Court of the United States, against the State of Georgia. On the 11th July, 1792, the marshal for the district of Georgia made the following return of the process to commeñce the suit: -“Executed .as within commanded ; that is to say, served a copy thereof on his excelléncy, Edward Telfair, Esq., Governor of Georgia, and one ■other copy on Thomas Carnes, Esq., the attorney-general of said .state. Eobcrt Forsyth, Marshal." The state paid 'no attention to the process, and did not deign to enter an appearance in the case. The plaintiff moved for leave to enter an appearance for the state, unless the state, after reasonable notice of the motion, should cause ,an appearance to be duly entered, or show cause to the contrary; .and that judgment by default might be entered and a writ of inquiry awarded. It was argued by counsel for plaintiff. Dallas and Ingorsol presented a written remonstrance and protestation on be- ’ half of the state against the jurisdiction of the federal court; but ■in accordance with positive instructions, declined urging the question. The majority of the judges — Jay, Chief Justice; Wilson, Blair, and Cushing, Justices — held that the federal'court had jurisdiction. Iredell, J., in an able dissenting opinion, hold that a state ■could not bo sued. Chisholm’s Executors v. Georgia, 2 Dall. 419. In February term, 1794, judgment was rendered for the plaintiff in the case, and a writ of inquiry awarded. The writ was, how•ever, never executed nor sued out.
The amendment (article 11) of the constitution was shortly *after adopted, expressly providing that “the'judicial power -of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects -of any foreign state.” Georgia maintained that the provision in *237 the constitution, previous to the above amendment, that “the judicial power of the United States shall extend to controversies between a state and citizens of another state,” could not be so Construed as to make a state a defendant, inasmuch as no power had. been delegated whereby a sovereign state could be served with process or made amenable to the federal government, or any department thereof, without her consent; that a state could only be a. suitor in the federal court as plaintiff, or by a voluntary appearance as defendant.
But I only here refer to the judicial act and position of Georgia,, as expressed by her in this case, to show that she took the same view, at the time of its adoption, of the provisions of the constitution as those expressed in their respective ratifying conventions by' the other states. She promptly met and opposed the first assumption of superiority to her state government on the part of the federal government, through her judicial department. And that state-maintained, with a dignified and unyielding firmness, her own soverignty and independence as a co-ordinate government. Her con- ■ duct upon the occasion referred to, is perhaps not less expressive of her sentiment in regard to the limited powers and co-ordinate character of the federal government, than are the proceedings of the other states of their sentiments, more formally expressed in their ratifying conventions.
Nor does the fact of the amendment of the constitution referred to afford any evidence that a retraction of any powers, actually before delegated to the federal government, was thereby intended by the states. It was evidently only intended as a positive prohibition to the federal government’s attempted exercise of a power or superiority *over the state governments, for the exercise of which there was before no permission or authority under the constitution; and which, under the original draft, it was not supposed the federal government would presume to assert.
In the case referred to, of Chisholm’s Executors v. Georgia, Judge Iredell, in his opinion, expresses his views upon the relation of the general and state governments as follows: “Every state in the Union, in every instance where its sovereignty has not been delegated to the United States, I consider to be as completely sovereign as the United States are in respect to powers surrendered. The United States are sovereign as to all the powers of government' actually surrendered; each state in the Union is sovereign as to all. *238 ■■powers reserved. It must necessarily be so, because the United .States have no claim to any authority but such as the states have .'Surrendered to them. Of course the part not surrendered must remain as it did before. The powers of the general government, either of a legislative or executive nature, or which particularly •concerns treaties with foreign powers, do for the most part (if not wholly), affect individuals, and not states; they require no aid from any state authority. This is the great leading distinction between the old articles of confederation and the present constitution.” 2.Dall. 419.
As still further evidence that the views expressed by the opinions in the Prigg ease in relation to the powers of the general government under the constitution, are utterly opposed to those of the founders of the constitution, I refer again to Mr. Madison. In the .29th number of the Federalist he expresses his views of the limited powers of the general government, and' its relation to the state governments, as follows : “The idea of a national government involves in it not only an authority over the -individual citizens, but an indefinite supremacy over all persons and things so far as they -are objects of lawful government. Among a people consolidated into one nation this supremacy *is completely vested in the national legislature. Among communities united for particular purposes it is vested partly in the general and partly in the municipal legislatures. In the former case all local authorities are subordinate to the supreme, and may be controlled, directed, or abolished by it, at pleasure. In the latter the local or municipal authorities form distinct and independent portions of the supremacy, no more subject within their respective spheres to the general authority than the general authority is subject to them within its own sphere. In this relation, then, the proposed government can not be deemed a national one, since its jurisdiction extends to certain enumerated objects only, and leaves to the several states a •residuary and inviolable sovereignty over all other objects.”
And still further, in urging the adoption of the constitution, Mr. Madison says: “ This assent and ratification is to be giyen by the people, not as individuals composing one entire nation, but as composing the distinct and independent states to which they respect•ively belong. It is to be the assent and ratification of the several ■..states, derived from the supreme authority in each state, the auibhority of the people themselves. The act, therefore, establishing *239 the constitution will not he a national, but a federal act. That it will be a federal and not a national act, as these terms are understood by the objectors, the act of the people as forming so many independent states, not as forming one aggregate nation, is obvious from this single consideration, that it is to result neither from the decision of a majority of the people of the TJnion, nor that of a majority of the states. It must result from the unanimous assent of the several states that are parties to it; differing no otherwise from their ordinary assent than in its being expressed, not by the legislative authority, but by that of the people themselves. Were the people regarded in this transaction as forming one, the will of the majority of the whole people of the United States would bind the minority *in the same manner as the majority in each state must bind the minority, and the will of the majority must be determined by a comparison of the individual votes, or by considering the will of the majority of the states as evidence of the majority of the people of the United States. Neither of those rules has been adopted. Each state, in ratifying the constitution, is considered as a sovereign body, independent of all others, and only to be bound by its own involuntary act. In this relation-, then, the new constitution will, if established, bo a federal and not a national constitution.”
The views expressed by Mr. Madison as to the relation and character of the federal and state governments, are not only entitled to very great respect from the source from which they emanate, and the time and circumstances under which expressed, but they will be found sustained, I apprehend, from the closest examination of the constitution itself, and the practical operations of the federal government and of the states under that instrument.
I know it has' been said by those who deny the sovereignty of the state governments, as thus expressed, that the expressions in the preamble of the constitution, “we, the people of the United States,” and “for the United States of America,” are inconsistent with the views entertained by Mr. Madison and Mr. Jefferson. But it is quite obvious that these expressions, at the time made, could not have been understood as meaning anything more than “we, the people of the” states respectively, which, as parties to this instrument, agree to become united for the purposes therein expressed; and that, as citizens of the respective states, they .agreed to adopt the constitution for the states of America sc *240 ■united. Indeed, the very expression, “United States of America,”' was used in, and seems to have been taken from, the articles of confederation. And as only an amendment of the articles of confederation was proposed by the formation and adoption of the 'constitution, the same expressions used in the latter *must bo intended to be of the same import as when used in the former. But it is not pretended that the expression, “ the delegates of the-United States of America,” as used in the articles of confederation, meant anything more or less than the delegates of the respective states of America, which had thereby become united for the purposes therein expressed. And in accordance with this meaning it was provided :
“ Art. 1. The style of this confederacy shall be: ‘ The United States of America.’
“ Art. 2. Each state retains it sovereignty, freedom, and independence, and every power, jurisdiction, and right, which is -not by this confederation expressly delegated to the United States in Congress assembled.”
And the same relation of the general government to the states-expressed in this article 2, and limitation of its powers are, if possible, still more strictly expressed under the constitution by the provision that,11 the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.” Thus taking away the implication, that powers not delegated to the state governments, by the people or citizens thereof, could be exercised by the general government when not delegated under the constitution.
Again, the construction and operation of the general government in its exercise of the law-making power as clearly indicate its character to be federal instead of national, under the constitution, as they did under the articles of confederation.
Every state, under the constitution, as under the articles, sends to the Congress its own delegation, as a component part of the Congress. The citizens of the respective states have no power to act without their own respective states, either in sending a delegation to the house of representatives, or to the senate. So, too, in electing- the president, each state furnishes its own electors. And these electors *of the respective states can only be appointed under the legislation of the states respectively. And when appointed, they do not even cast their votes for the president in a *241 general Congress, as the delegates under the articles of confederation did, in electing the president of that Congress. The electors under the constitution meet and cast their votes for president in their respective states. And neither representatives, senators, nor electors can be appointed under the provisions of the constitution, except under the acts and provisions of the legislatures of the respective states.
It therefore not only appears that the general government was constituted by the states, but its continuance is still, under the constitution, as it was under the articles of confederation, dependent upon the state governments.
The general government is, therefore, as maintained by Mr. Madison and Mr. Jefferson, a federal and not a national government; and the states, as to all powers not delegated by nor prohibited to them under the constitution, remain independent sovereign governments as they were under the articles of confederation.
The facts alluded to in connection with the formation and adoption of the constitution show conclusively that the framers of the instrument, and the people of the several states at that time, intended and understood the federal government to be one of limited and enumerated powers, and only co-ordinate with the state governments. It is therefore evident, both from the language and the early construction of the instrument, that the rights of the several state governments are as full and ample under the constitution to protect their powers which they had not delegated, as is the federal government to protect the powers which had in fact been delegated to it. This right to protect its own legislative, executive, and judicial powers, belonged to each of the states at the time of the adoption of the constitution. The states in convention refused to surrender the right, or even to suffer it to *be qualified; the power was not delegated in the constitution, nor by it prohibited to the states, and is therefore reserved and still belongs to the states. The judiciary of each state being, before the adoption of the constitution, the final arbiter therein of the limit and extent of her jurisdiction and powers, and the states having in no respect sur-; rendered or impaired their sovereign right and power in that regard, the Supreme Court of each state remains the final arbiter,, as to such state, of the extent and limit of her powers and jurisdiction. It therefore follows as an inevitable conclusion, that the-government of the United States has no more right to enforce its *242 ■decisions or those of its judiciary against those of the separate ■states, where the two judiciaries disagree as to the extent of their respective powers, than have the state governments to enforce their ■decisions against the federal government And the authority of •the state when exercised by any state official ought to be a perfect .justification for the act so done under and by virtue of such authority; the same as the authority of the federal government, when ■exercised by any of its officials, ought to be their justification. The federal and the state governments are placed by the constitution in this respect on equal grounds. Neither is made superior to the other. Nor is either subordinate. Each is co-ordinate.
And this co-ordinate relation of the federal and state governments in their respective departments, however strenuously opposed by one party in the formation of the constitution, was maintained by the majority of the convention, as we have seen, and was conceded and established by the framers of the constitution, and by the people upon its adoption. This fully appears from the speeches in the state conventions for its adoption, made by Hamilton, "Wilson, Marshall, and others, who had favored the idea of a national government. In all their discussions in the constitutional convention it was not pretended by any one that either the general or state governments would have the bright to determine for the other the line of partition of their respective powers — the delegated and thereserved powers — unless such authority was expressly given by some provision of the constitution. Hence, as we have seen, Mr. Hamilton and other friends of •a strong national government, brought forward and strenuously insisted upon those various plans to give the federal government, either by its legislative, judicial, or executive branch, a superiority ■and control over the state’ governments. But those projects being •all successfully resisted by those opposed to a national government with unlimited powers, no supervisory power over the state governments was claimed for the federal government, by force of any other provision of the constitution. The two governments, state and federal, were regarded by both parties as then remaining co-ordinate ■and equal. Either being superior or subordinate, both parties •consented to leave, and did, in fact, leave them as equal co-ordinate governments to control each other; and by their mutual action and reaction to keep each other in their proper sphere. And however ^serious were the appi’ehensions of the advocates of a contx'olling *243 national government, of a dissolution of the general government from the defeat of their favorite plan, they yielded to the will of the majority; relying upon the right of amendments secured by article 5, whenever the same should be found necessary.
The general government was, then, federal, and not national. It was one with only delegated, limited, and specified powers, neither superior nor subject to the state governments. And neither reason nor philosophy did then nor does now require any other relation between the two governments. No other relation so well accords with right, reason, and philosophy.
It is true, there were not wanting, at the inception of the federal government, predictions from the advocates of a national government, that, wanting some one supreme and kingly power, absolute to control all others, anarchy *and dissolution must necessarily ensue. And this has ever since been a controlling sentiment with those wanting confidence in a free popular government. It would, however, not only be unreasonable to expect the federal government to remain a limited and free government, if left to determine the limit of its own powers and that of the state governments ; but, by being invested with that j>ower, it would thereby necessarily be a government of unlimited powers. It is no matter how limited the powers delegated might be fixed by the express provision of the constitution ; nor how explicit the language of the instrument in asserting the right of the states to the reserved powers ; leaving the federal government to determine the line of partition must necessarily make the federal government absolute, and utterly destroy the independence of the state governments. Any usurpation of power on the part of the federal government in such case would be legalized by merely the approval of the usurping party; and such approval would be, for the most part, doubtless, as certainly signified by the act of usurpation, as it could afterward be by a formal adjudication. I repeat, therefore, that to make the federal government the sole arbiter between the state governments and itself, as to what powers belong to each, would necessarily change our limited federal government into an absolute national one, and utterly subvert the independent state governments.
We have seen that the majority in the constitutional convention regarded the real danger to be consolidation, and not dissolution, and refused and rejected each plan proposed to make the state governments subordinate to the federal government. We have also seen, *244 that to have so made the state governments subordinate, by constituting the federal government the sole arbiter of its own powers, .as against those claimed by the states as their reserved powers, would necessarily change the federal government from its limited character to that of au unlimited national government, and inevitably lead to centralization. *It would seem to follow, therefore, that if the constitution is really of such a character, the provisions rendering it so were neither known nor understood, nor so intended, by the framers of the instrument, or by the different states adopting it.
Nor can it he pretended that there is any peculiar fitness in the federal judiciary being the “ common arbiter” between the federal and state governments, rather than the legislative or executive department of that government. Each of the three departments of that government act under the same oath to support the constitution of the United States. Neither department of the federal government are required by their official oath to support or respect the constitutions of the states. Indeed, the act of making the federal judiciary the common arbiter in a conflict between the two governments in relation to the division of powers, is even more unreasonable than it would be to make the state judiciary such common arbiter. The state judiciary is under tbe same obligation, by their official oath, to support the constitution of the United' States with the iederal judiciary; and the official oath of the state judiciary also imposes on them an obligation in like manner to support the constitution the state To thus constitute the limited federal government solo arbiter, by her judiciary or any other department, as to the partition of powers, would have been an absurdity. It would have been for the states to make the created greater than tbe creating agencies — to make the limited government an absolute one. It would have required tbe state governments to look only to what they apprehended as the real source of their danger, for protection against the danger. It would be a consent, on the part of the states, to hold their reserved powers as mere tenants at will under the federal government. Indeed, no sensible reason can he adduced why the federal government should he the sole arbiter, rather than the state governments, if a conflict of power between the two governments *is to he decided exclusively by either of the parties. The truth is, it would be absurd to assume that either one should be sole arbiter between itself *245 and the other. But to assume that both possess the right of deciding, each equally for itself, as to the line of partition between the delegated and reserved powers, is rational. And such a relation— that of equal, co-ordinate governments — is alike consonant with reason and philosophy, and with the actual provisions of the constitution. No other relation of two such governments could pos ■siblybe made consistent with the harmonious and continued operations of both. But, being co-ordinate, and neither having the ex-■elusive right to judge of its own jurisdiction or powers as against a like right on the part of the other government, where they disagree as to the extent of their respective powers, each must noees-sarily and reciprocally be a negative upon the acts of the other. This would be, to enable each to protect the authority actually belonging to itself against the encroachment of its co-ordinate gov«ernment. Centralization of all power in the government of the United States can only be prevented by this construction, or rather by this adherence to the provisions of the constitution. And this fact was evidently seen by the framers of the constitution, and by the states adopting it. Otherwise, having successfully resisted and ' rejected every attempted express provision tending to consolidation, the conclusion is irresistible that if any common arbiter had been contemplated between the two governments, some provision •would evidently have been inserted, giving the state government a concurrent voice with the federal government in appointing .-such common arbiter. . But the fact is, no such common arbiter was ever consented to or contemplated by the framers of the constitution. The framers of the government were wise men. They knew that it was safer to rely upon the reciprocal influences of the federal and state governments upon each other in their operations. Observation and science showed that the ^continued existence and healthful action of all well-organized bodies in physical economy, was the natural result of the action and reaction of the constituent parts of the organic body. And the framers of the constitution regarded the same principle applicable to well-organized states or political bodies. They had the wisdom to perceive that the perfection of organic action in organized society and government could only be attained by the action and counteraction of two or more forces. They knew that from this fact is deduced the political axiom, that there can bo no ■constitution without a division of powers, and no civil liberty with *246 out a constitution. But they knew, also, it would evidently be a vain thing to construct a government with a division of powers, if not so protected in that division as to prevent an immediate aggro-^ gation of the powers. And this, they perceived, could only be' effected by each party having the rights and powers of self-protection equally as against any other. And the idea of co-ordinates excluding the idea of superior and subordinate, and necessarily implying equality, the framers of the constitution regarded as alone adequate to insure such right and power of self-protection. They relied, in short, upon the same security for self-preservation of each co-ordinate government in its respective sphere, under the constitution, that every free constitutional government relies upon, and must necessarily rely ujron, for the self-preservation of the co-ordinate branches of its government in their respective spheres — action and reaction, and that comity necessarily induced by the relation and action of the co-ordinate departments. In every free constitutional government, the governmental powers must be distributed. The legislative, the executive, and the judiciary must each be distinct ; they must each be, in a certain sense, independent; they must each be co-ordinate — neither supreme and neither subordinate— in order to constitute a constitutional government, as contradistinguishedfrom an absolute government. Interferences of *th ese co-ordinate departments, in the most perfect constitutional state government, must, necessarily, occur more or less frequently. They are the result of the departments of government being all co-ordinate, instead of one being supreme and all the others subordinate. And being left to decide upon the constitutional powers belonging to itself in cases subject, to doubt, each department acting upon itspwn judgment of the limitation of its powers, the line of boundary of each is found, in that respect, often variant from that of the-other. And so, each department acting on its own judgment upon the subject, the action of the two departments is often for a time inharmonious and in conflict. But the very fact of such conflict induces caution, circumspection, and moderation in action on the part of both. And their counteraction leads to discussion and a more careful comparison of the different views of each, which is-always, in constitutional governments, found to result, whether’ by adjudication, arbitrament, or mutual compromise, in a final harmony of action and agreement between the co-ordinates as to the limitation of their respective powers.
*247 It is but reasonable to suppose that all the foregoing considerations were far more fully and forcibly urged and opposed by the friends of a free constitutional government on the one side, and the friends of a national government on the other. And it was doubtless owing t.c the general understanding that the federal government could only exercise the powers delegated to it, that occasioned the violent opposition to the first apparent encroachments of that government upon the police powers of the states.
The acts of Congress already referred to, passed in 1798, called the “ alien and sedition laws,” although a less extravagant encroachment upon the police powers of the states, it is well known were peculiarly offensive to Mr. Jefferson and Mr. Madison, and those of similar political views, as being an exercise of the police powers of the states, as well *as the exercise of undelogated powers by Congi’ess. As expressive of their views of such legislation, I will here refer to the two following resolutions, said to have been drawn and submitted by those distinguished statesmen, to the legislatures of Virginia and Kentucky, shortly after the passage of the'“ alien and sedition laws:”
“ Resoloed, That the several states comprising the United States of America, are not united on the principle of unlimited submission to the general government; but that by compact, under the style and title of a constitution for the United States, and amendments thereto, they constituted a general government for special purposes; delegated that government certain definite powers, reserving, each state to itself, the residuary mass of right to their own self-government; and that whensoever the general government must assume undelegated powers, its acts are unauthoritative, void, and of no force; that to this compact each state acceded as a state, and as an integral party, its co-states forming, as to itself, the other party; that the government created by this compact was not made the exclusive or final judge of the extent of powers delegated to itself, since that would have made its discretion, and not the constitution, the measure of its powers; but that, as in all other cases of compact among parties having no common judge, each party has an equal right to judge for itself, as well of infractions as of the mode and measure of redress.
“ Resolved, That alien friends are under the jurisdiction and protection of the laws of the state wherein they are; that no power over them has been delegated to the United States, nor prohibited *248 to the individual states, distinct from their power over citizens; and it being true, as a general principle, and one of the amendments of the constitution has also declared ‘that the powers not delegated to the United States by the constitution, nor prohibited to the states, are reserved to the states respectively, or to the people,’ the act of Congress of the United States, passed on *22d day of June, 1798, entitled ‘an act concerning aliens,’ which assumes power over alien friends, not delegated by the constitution, is not law, but is altogether void, and of no force.”
And it was in relation to this exercise of undelegated powers by Congress, that Mr. Madison, upon another occasion, thus expressed himself: “Whenever, therefore, a question arises concerning the constitutionality of a particular power, the first question is, .whether the power be expressed in the constitution. If it be, the question is decided. If it be not expressed, the next inquiry must be, whether it is properly an incident to an express power, and necessary to its execution. If it be, it may be exercised by Congress. If it be not, Congress can not exercise it. ... I consider the foundation of the constitution as laid on this ground, that all powers not delegated to the United States by the constitution, nor prohibited by it to the states, as reserved to the states or the people. To take a single step beyond the boundary thus specially drawn around the power of Congress, i-s to. take possession of a boundless field of power no longer susceptible of any definition
We all agree that every provision of the constitution of the United States is entitled to the highest respect, as well by state legislatures and other departments and officers and citizens of states, as by the federal legislature and the various departments of the federal government. Nor do I regard the immediate result, either upon the slaveholder or the slave, to be very materially affected by the fact of this fugitive clause of the constitution being enforced by federal legislation, or by state legislation, if similar laws were passed by each. And no particular difference is observable, I apprehend, in the provisions of the act of 1793, by Congress, and the statutory provisions of the states upon the same subject, already alluded to. I regard the legislation of the states equally exceptionable with the act of Congress of 1793, in not allowing a jury trial, and all the benefits *of due process of law to the person against whom the claim is made of so owing *249 service and having escaped, when he denies the charge so made against him.
But the great and most important question presented is, in my estimation, the claim of right to exercise such police power, necessarily involved in the act of legislating upon the subject by Congress.
If the federal government can arrogate to itself, in utter disregard of the claims of the state governments, and of article 10 of the amendments to the constitution, the exercise of this police power, it is utterly idle to longer speak of state sovereignties. The state governments can not then be said to hold any powers except as tenants at will under the federal government.
I have already alluded to the alarm justly created by the federal government’s invasion of the police powers of the states, in enacting the “alien and sedition laws.” But those acts were by no means such an extravagant and utterly unwarrantable usurpation and exercise of the police power of the states, as is this fugitive act of 1850. The act respecting aliens could not be justified, it is time, in public opinion, as a reasonable exercise of the war power. If the states were respectively willing to tolerate the residence of aliens, it was justly insisted that the federal government had no power under the constitution to send its marshals within a state to remove that class of inhabitants But the act of 1850 assumes the power, not merely to remove “ alien enemies,” but native-born friends of the government and citizens of a state, without hearing, and without any opportunity of a defense to the claim made against them, whenever a claim in a distant state or territory (as provided in section 10 of the act) is made against such person. It is the usurpation of a police power by the federal government, which utterly strips the state of the necessary police power for the protection of her own citizens — of even her own magistrates and officers, if' such claim happen to be leveled against them.
*1 will not here remark upon the more odious, despotic, and profligate provisions of the act, such as the infliction of a penalty not exceeding $1,000, and imprisonment not exceeding six months, for aiding, directly or indirectly, a person owing service to escape from his pursuer, and providing a double fee for the commissioner to surrender, instead of discharging, the person claimed; but I propose to consider for a moment the magnitude and extent of this police power, thus sought to be wrested from the states by the federal government.
*250 The act assumes to constitute all commissioners appointed and to be appointed throughout every state, a court with powers supe-, rior to the supreme judiciary of the state, and to invest them respectively with supreme power to pass sentence of extradition from the state, upon any person therein charged before him with owing service without the state, etc. The act assumes the power to impose the penalty of $1,000 upon any citizen of the state, honestly discharging his duty as marshal or deputy marshal, for refusing to accept the warrant and arrest the fugitive; and then imposes on such marshal or deputy a liability for the full value of the services of the fugitive, “ should such fugitive,” after being arrestecl, escape? whether with or without the assent of such marshal or his deputy; and such marshal and his sureties are made liable to be prosecuted for the same on his official bond; not in the state, however, where the delinquency or liability occurred, but, in the language of the act, “ in the state, territory, or district whence he escaped.” The act further authorizes the commissioners so constituted into courts, to appoint, in their discretion, “ suitable persons to execute warrants” and other process, with authority to such appointees “to summon and call to their aid the bystanders or posse comitatus of the proper county, when necessary, to insure a faithful observance of the clause of the constitution referred to, in conformity with the provisions of the act.” And, in the language of the act, “ all good citizens are hereby commanded *to aid and assist in the prompt and efficient execution of this law, whenever their services may be required as aforesaid for that purpose; and said warrants shall run and be executed by said officers anywhere within the state within which they are issued.”
Now if Congress has this police power, it. may enact a law,, doubtless, imposing any duties upon the citizens of the state which the state legislature could, if the power belongs to the state. And those who contend that the power belongs to the federal government, admit the power of Congress to require all good citizens of the state to render such services as directed by the act, for its “prompt and efficient execution.” It follows, therefore, if Congress has the power to legislate upon the subject, it may be almost entirely at its own discretion to what extent it will exercise the police power of the state. If competent to command all good citizens of a state to aid and assist in the prompt arrest and extradition from the state, any person therein charged with owing service *251 in another state, as a runaway apprentice or servant, it certainly was competent to have annexed the thousand-dollar penalty to this-clause for a disregard of the duty imposed. And inasmuch as the laws of the United States, made in pursuance of the constitution! as well as the constitution itself, are made “the supreme law of the land,” it would follow that Congress had the power to require any citizen of the state, when called upon, at the will of any deputy, to be marshaled into service to hunt, arrest, and return anyone charged as a runaway apprentice or servant. And when called upon for that purpose, no matter what his avocation, the'farmer-must leave his plow and the mechanic his shop to join in the pursuit. Nay, more ; grant that this tremendous power belongs to the federal government, and all the functions and offices of a state government may be thereby impeded. Suppose the jurors on their way to court, or while there, or the judges, or any other officers of state, to be called upon by a marshal *to aid “ in the prompt and efficient” return of a fugitive from service, the law of Congress, being the supreme law, must necessarily be obeyed rather than the state law. And if indeed the federal government has this power, what objection could, in law, be made to its exercise, by requiring every able-bodied citizen of the state to render a given-amount of service in patrol companies, to hunt, and apprehend,, and return fugitives generally?
Indeed when this police power, of such vital importance to the state governments, shall be once surrendered to the federal government, the state governments must become utterly powerless to protect their own citizens from even more unreasonable exercise of such power by the federal government than has been supposed.
And this same power, once conceded to the federal government by the states, will be found a club of Hercules in the hands of that government for many other purposes than that of catching and-restoring runaway slaves and apprentices. Some future administration may, quite probably, come to regard other compacts of the-constitution equally entitled to the respect of an earnest enforcement by the federal government. For it is very obvious, as Chief Justice Taney well remarked, that “there are other clauses in the constitution in which other individual rights are provided for and. secured in like manner-. . . “ thus, for example, the constitution provides that no state shall pass any law impairing the validity of a contract. . . “ that the citizens of each state shall *252 bo entitled to all the privileges and immunities of citizens in the ■several states.” 16 Peters,. 628, 629. And the chief justice might have also referred to the provision, “no person shall be . . . deprived of life, liberty, or property without due process of law; and still other clauses of the constitution, in which, as he ■.says, “ other individual rights are provided for and secured in like manner” asare those in relation to persons held to sei’viee and ■ labor. These provisions are all obviously subject to a faithful ex-ocution by the same ^legislative power, whether federal or :state, with that of the provision relating to fugitives from service. And for myself, I can not but regard the power of executing, by legislative provisions, each and all of those compacts as clearly Belonging to the states. A transfer of that power from the states to the .federal government, even if done by a clearly expressed .amendment of the constitution, I should regard as most unfortunate, and one, in its tendency, greatly deranging the well-balanced powers, as at present constituted, of the federal and state governments. It would, in my opinion, render imminent the greatest ■danger of our government, by giving an irresistible impetus to the already evident tendency to a centralization of all governmental powers in the federal government. But while, as I have said, I -should regret to see such an effect, by even an amendment, the very fact of its having been produced by an amendment would be ■a good reason to hope that when its evil tendencies should be discovered, they might be removed by an amendment. Yet no such hope can be reasonably entertained for a correction of the evil by .amendment, if these police powers, clearly belonging to the states under the constitution, are thus arbitrarily usurped and wrested from them by the federal government, and the states, instead of maintaining their rights, only invite further aggressions by passive submission.
And I will here add that, in my apprehension, one of the great •evils, and of most alarming tendency in the federal government, is .a disposition to suffer the important provisions of article 5, of the •constitution, in relation to amendments, to be utterly superseded bj judicial construction. The framers of the constitution contemplated formal and actual'amendments of the constitution, and further enlargements or restrictions of the powers of the federal government, according to the public exigencies or convenience. But •they expressly provided, in article 5, that the expedie ncy of such *253 amendments should be expressed by a two-thirds vote of both houses of Congress, or by two-thirds *of the states, by their respoctive legislatures. It never was contemplated that every real or imaginary difficulty in the minds of the court, in adhering to actual provisions of the constitution, should be obviated by that department’s so construing the instrument as to enlarge, vary, or qualify the powers and provisions as expressed, to suit any imagined exigency.
But what to my mind is conclusive to show the utter fallacy of the argument, in favor of the assumption on the part of the federal judiciary, to act as sole umpire between the two governments, is-the fact that the constitution contains no provision by which a state can possibly be made amenable to the process of the federal judiciary. * And it is manifest that there is no provision in the constitution which gives the sli ghtest intimation of the federal judiciary having authority to enforce its decisions against a state where the decisions of the federal and state governments are in conflict. Without such power conferred by the constitution, it is evident that neither the federal nor state government could enforce the decision of its j udiciary against the other government. For although a government may be a party plaintiff in a case in court, it can never be-made a defendant, or in any way amenable to judicial process, unless it be by the express consent of such government, and in a mode-by herself directed. It is therefore evident, that inasmuch as there is no express provision in the constitution by which either of the co-ordinate governments can be made amenable to process, or made a defendant, neither can be made subject to the judicial decisions-of the other. The proposition that the provisions of the constitution can be of force upon either government as a law, in the sense-that it is upon the individual citizen, certainly can not be for a moment maintained. The provisions of the constitution are only of force upon the respective governments, as governments, id their mutual relations, as compacts. This necessarily results from the character of the parties.
*It is not, of course, doubted that the decisions of the Supremo Court of the United States, in all eases arising under the-constitution, and under the laws and treaties of the United States, coming before that court for adjudication, arc final and conclusive in. the case. But the same is equally true of the decisions of the Supreme Court of a state in all like cases. The decision of the Supreme' *254 ■’Court of a state, and, indeed, the decisions of inferior courts of the several states, when not appealed from, are each and all alike final .and conclusive upon, the rights of the parties in the case. And the same may be true as to foreign courts. All the courts of the several states, as well as the federal courts, are bound alike by official oath; as well as law, and even foreign courts are bound by law, to give the same effect to the constitution, laws, and treaties in their respective decisions. It is therefore not even peculiar to the federal judiciary to decide upon all cases arising under the constitution, laws, and treaties of the United States, by the provisions of the constitution extending its jurisdiction to such cases. Much less ■ does it appear to have been thereby invested with power to determine, as sole arbiter, any contest arising between the federal and state governments, in relation to the right to exercise a» power claimed by each. It is therefore equally true of the decisions of ■the Supreme Court of the United States, as it is of the decisions of the state courts, that the decision is only binding in the case, and on the parties litigant. It may exist as a precedent in its own courts, ■and, as such precedent, be authoritative as arule upon the subordinate federal courts; but the decision of the Supreme Court of the United States can not settle any question as against the state government. It is not even authoritative as a precedent for the state courts, in any other sense than would 'be a decision at Westminster, in the House of Lords, or a decision of the Supreme Court of another ■state, or that of any other eminent tribunal.
In relation to the authorities relied upon by the majority of the *court in this case, I have this to say: that from the views already expressed, the decisions of other courts, whether of other states or of the United States, are alike only authoritative upon this court, as the same tend to convince us, by the force of their reasons, of the correctness of their conclusions. Notwithstanding •this court, as a rule of practice, has seen fit, in proper cases, to suffer its final judgment to be revised by the Supreme Court of the United States, according to the rules of that coui’t, as expressed by section 25 of its judiciary act, the judgment of that court has no authoritative influence beyond the particular case so revised. Section 25 of the practice act of the United States courts only con- . templates the prevention of any restriction of the authority of the .federal government. It is not thereby permitted to either party in utho case to appeal from the judgment of a state court. Even if a *255 -state court should hold an act of Congress constitutional which the federal courts had held unconstitutional, the case can not be removed by the party aggrieved.
But it is sufficient here to say, I do not regard the Supreme Court •of the United States as sustaining any other relation to this court than that of a co-ordinate court, as to its decisions in any other case.
While therefore I regard the decisions of the Supreme Court of the United States as those of a court of very great eminence, I do not recognize its decisions as those of a superior court, sustaining to this court the relation that the House of Lords sustains to the superior courts of law and chancery in England. The rule, resting upon decorum and respect, requiring a subordinate court to regard the decisions of a superior court as precedents, does not apply to this court, then, in relation to the decisions of the federal court un,dcr the acts of 1793, or 1850, in other cases.
Looking, then, at the reasoning of the Supreme Court of the United States, afforded by each and all of the opinions which that court has ever expressed upon those acts, to ^sustain their constitutionality, and also upon the several opinions, with the reasoning given by the judges of the state courts in the cases referred to, I regard them alike as authorities, so far as they may tend to convince my understanding that they are a true exposition of law. Further than that, they are of no authority in this case.
And I will here add, that I admit the fact of the conclusion of any judge or lawyer in favor of a legal proposition, even without the reasoning being given, is entitled to respect in the consideration of the same proposition. But the weight of authority is hardly to be determined by the number of decisions or votes in favor of it, but rather by weight of opinions and strength of reasoning for or against the proposition.
While I am free to admit that the number of legal opinions against ■the constitutionality of the acts of 1793 and 1850, in relation to persons owing service, are less numerous than those in favor of their constitutionality, I am fully convinced that the weight of authority, in tho sense indicated, is, very decidedly, that Congress has not the power to legislate upon the subject, but that the power belongs to tho states.
In the case of Jack v. Martin, 12 Wendell, Judge Nelson, it is true, held that the power to legislate belonged to the federal government; but he places it upon the ground of the power being implied, *256 And the reason upon which he rests this conclusion, is the assumption by the judge that the general government was favorable to slavery, and the state governments could not' safely be trusted to discharge the duty imposed upon them by the constitution. In the same case, in the court of errors, 14 Wend., Senator Bishop adopted the same reasoning and conclusion so expressed in the Supreme Court by Judge Nelson.
Chancellor Walworth, in the same case, after stating that the law of 1793, if valid and binding, was one under which any free citizen of any state “ may bo seized as a *slave or apprentice who has escaped from servitude, and transported to k distant part of the Union, without any trial except a summary examination,” etc., proceeds, very carefully, to consider to which government the power of legislation belongs. His reasoning is not based upon any assumption that, as between the federal government and the state governments, one is to bo presumed to regard, and the other to disregard, its constitutional duties. The consideration of the respective claims of the two governments (the state and federal), is made by the chancellor without respect to person or party, but with a strict respect to the right to, and claim of, this power between the two governments. His mode of reasoning and conclusion is thus briefly expressed by himself: “I am one of those who have been in the habit of believing that the state legislatures had general power to-pass laws on all subjects except those in which they were restricted by the constitution of the United States, or their own local constitutions, and that Congress had no power to legislate on any subject except so far as the power was delegated to it by the constitution of the United States. I have looked in vain among the powers delegated to Congress by the constitution, for any general authority to that body to legislate on this subject. It certainly is not contained in any express grant of power, and it does not appear to be embraced in the general grant of incidental powers contained in the last clause of the constitution relative to the powers of CongressConst., art. 1, sec. 8, subd. 18. The law of the United States respecting fugitives from justice and fugitive slaves, is not a law to carry into effect any of the powers expressly granted to Congress, ‘ or any other power vested by the constitution in the government of the United States, or any department or officer thereof.’ It appears to be a law to regulate the rights secured to the individual states, or the inhabitants thereof, by section 2 of article 4 of the *257 constitution, . . but vests no power in the federal government,” etc. *Chief Justice Hornblower adopted the same reasoning, and arrived at the same conclusion, in a case before him in the State of New Jersey.
It is well known that Daniel Webster always entertained the opinion that this power belonged to the states, and not to the federal government, under the constitution. In his speech on the 7th of March, 1850, and when desirous of favoring the compromise measures, he thus expressed his opinion in relation to the question: “ When it is said that a person escaping into another state, and becoming therefore within the jurisdiction of the state, shall be delivered up, it seems to me the import of the passage is that the state itself, in obedience to the constitution, shall cause him to be delivered up. That is my judgment, I have always entertained it, and -I entertain IT NOW.”
And whatever may be said for or against the wisdom, motives, or propriety of his professed willingness to surrender his own opinion, that Congress had no power to legislate upon the subject, there is no doubt that Mr. Webster’s opinion remained unshaken through life, as he expressed it, that the power belonged to the states, and that any exercise of it by the federal government was a mere usurpation of the power, and without any warrant under the constitution.
The able opinions in the case of Booth, 3 Wis. 1, pronounced by the majority of the judges, rests upon similar reasoning, and sustain the same conclusions. .
While, therefore, I admit the number of judicial opinions to be in favor of the power belonging to the federal government to legislate for the removal from a state of persons charged with owing service in another state or territory ¡ I deny that the weight of authority is in favor of the existence of such power in the federal government under the constitution. I claim, in the first place, that the opinions of Jefferson, Madison, Marshall, Wilson, Iredell, Webster, Walworth and others, as shown to have *been by them respectively expressed, are utterly opposed to the power belonging to Congress under the constitution. And I further claim that their opinions, independent of the reasoning on which they rest, are entitled to as high respect, as authority, as are the opinions expressed by individual judges to the contrary, from the bench. And I further insist, that it is evident, from examination, that neither the historical facts nor the political propositions, upon which the reason *258 ing of the judges rests in arriving at the conclusion that the power belongs to Congress, are correct. Their reasoning I therefore regard as fallacious, and the conclusion derived therefrom, that the power belongs to the federal, and not to the state governments, as erroneous.
But as it respects the case before us, the return to the writ shows the case not to be within the constitutional provision in relation to fugitives. The return does n ot barely set forth a copy of an ordinary commitment by the federal court, as the cause of imprisoning citizens of this state. I grant that upon such a return, if we conceded the right of the federal government to legislate for the enforcement of this constitutional provision, we might presume that the record would show a case to be within the constitutional provision. But we are in this case left to no presumption. The sheriff has set forth a full copy of the record. The indictment as well as the judgment pronounced thereon, is before us; and that contains no averment that the fugitive was a “ person held to service ” under the laws of the state from which he escaped. And no other persons owing service than those owing the same under the laws of the state from which the person may have escaped, are required by the constitution to be “ delivered up.” That class is thus described in the constitution : “ Persons held to service or labor in one state under the laws thereof, escaping into another.” The indictment, therefore, no more shows a case in which the federal court had jurisdiction than *if the indictment had charged a mere general indebtedness on the part of the fugitive.
Our statute requires that the return shall set forth the authority at large, and the true and whole cause of such imprisonment. The sheriff has done so; and from such return I hold that no legal cause of imprisonment appears.
It is true, the act of 1850 provides for the removal of other persons than those owing service “under the laws” of the state, as provided in the constitution; but I maintain that, in whatever resj>ect the act is not within the provision of the constitution, it must necessarily be void, even if Congress had power to legislate. The following is the language of the act: “ Sec. 6. And be it further enacted, that when a person held to service or labor in any state or territory of the United States, has heretofore, or shall hereafter escape into another state or territory of the United States,”, etc., the person or persons to whom such service or labor may be due, or *259 his, her, or their agent, etc., . . . “ may pursue and claim such fugitive person,” etc.
The constitution only provides for the surrender of persons “held to service or labor in one state, under the laws thereof, and escaping into another state.” But the act of 1850 includes those “ held to service ” merely, whether or not held “ under the laws ” of the state, as provided in the constitution. And so, too, the act includes persons escaping into or from a territory of the United States, when there is not a word in the constitution in relation to escapes from or into territories. The provision of the constitution, being one in restraint of natural liberty, should, by the rules of interpretation, not he applied beyond what is clearly expressed. Smith’s Com., 621. “Interpretations legum pomce moliendee sunt, potius quam asperandee.” L. 42, ff. de peen.
Entertaining the views I have expressed of the great importance of the questions presented in this case, I have thought it not improper to present more fully the grounds and reasons that have led me to dissent from the opinion *of the majority of the court than I should otherwise have felt justified in doing.
And I will, in conclusion, say, that while it is with regret that I find that the members of this court can not arrive at the same conclusion respecting the judgment to be given in this caso, my own convictions are so clear as to the legal questions, and, I may say, questions of polity, involved and presented in this case, that I find it utterly impossible to bring my mind to entertain a reasonable doubt as to the conclusions to which I have arrived, and which compel me, in uttering my own opinion, to dissent from that pronounced by the majority of my brethren.
In every view I have been able to take of the subject, after a careful examination of all the arguments and reasoning of those eminent judges, and their opinions in favor of the power to legislate for the removal from a state of persons owing service, etc., having been delegated by the states to the federal government under the constitution, I am unable to find any reasoning or evidence to establish the proposition. The language of the constitution, the history of its formation and adoption, and the opinions expressed by its framers at the time of its submission to the people, and afterward, all bear witness against this police power belonging to the federal government under the constitution.
It is a power, in my apprehension, not only remaining to the. *260 states under the constitution, by as undoubted a title as any other police power with which they are invested, and which they now exercise, but it is one of which the states can not, in my opinion, be deprived, without vitally impairing their sovereignties as independent state governments. And it is, at the same time, as I regard it, a power that can not be asserted and exercised by the federal government, without greatly impairing the excellencies of that government by most injuriously changing its relations to the state governments.
* While, therefore, I concede the. largest discretion to the federal government in the exercise of its incidental powers “ to make all laws which shall be necessary and proper for carrying into execution” all delegated powers under the constitution, I am constrained to regard its exercise of power in passing the act of 1850 for the extradition from a state of persons “ owing service,” etc., as the exercise of neither delegated nor incidental powers, but as strictly the exercise of a police power over the citizens of a state— a power unquestionably reserved by arid belonging to the states under the constitution. I regard the act of 1850, therefore, as ■passed without any constitutional authority, but in contravention ■of the powers reserved under the constitution to the states. It is, then, not a law “of the United States,” made in pursuance of the ■constitution, and is therefore of no validity.
In full confidence of the correctness of these conclusions, I am therefore clearly of the opinion, that the judgments under which the relators are imprisoned are utterly void, and that they ought to ibe forthwith discharged.